**Alexander S. YESSENIN–VOLPIN, Plaintiff,**

v.

**NOVOSTI PRESS AGENCY, TASS Agency and the Daily World, Defendants.**

**No. 77 Civ. 639 (CHT).**

United States District Court, S. D. New York.

Jan. 23, 1978.

Samuel B. Mayer, New York City, for plaintiff.

Wolf, Popper, Ross, Wolf & Jones, New York City, for defendants Novosti and TASS; Martin Popper, Roger C. Algase, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

Plaintiff Alexander S. Yessenin-Volpin, "a persistent defender of the civil and hu-

man liberties of the Russian people," Complaint ¶ 5, commenced this action in New York State Supreme Court seeking damages for libel against defendants TASS Agency ("TASS"), Novosti Press Agency ("Novosti") and The Daily World, a newspaper of the Communist Party of the United States. By petition filed February 9, 1977, TASS removed the action to this Court. Defendants TASS and Novosti now move for the dismissal of this action on the grounds: (1) that they are immune from the jurisdiction of this Court with respect to the acts alleged in the complaint under the Foreign Sovereign Immunities Act of 1976 ("Immunities Act"), 28 U.S.C. §§ 1602–11; (2) that the Court lacks personal jurisdiction over the defendants; and (3) that the complaint fails to state a cause of action against these defendants. For the reasons set forth below, the Court concludes that TASS and Novosti are entitled to claim sovereign immunity with respect to the claims against them in this action and that the case against them must therefore be dismissed for want of jurisdiction.

### Immunities Act

■ The Immunities Act[1] establishes a comprehensive procedure whereby a plaintiff may bring a foreign state or one of its political subdivisions, agencies or instrumentalities before an American court, either federal or state, obtain a ruling on the sovereign immunity of that entity, and, if immunity is found not to exist, secure an adjudication and satisfaction of its claims. The Act's central feature is its specification of categories of actions for which foreign states are not entitled to claim the sovereign immunity from American court jurisdiction otherwise granted to such states. These exceptions are contained not in the sections of the Act which describe the grounds on which jurisdiction may be obtained, however, but are phrased as substantive acts for which foreign states may be found liable by American courts. This effects an identity between substance and procedure in the Act which means that a court faced with a claim of immunity from jurisdiction must engage ultimately in a close examination of the underlying cause of action in order to decide whether the plaintiff may obtain jurisdiction over the defendant.

The Court's attention must first focus, however, on whether the entity sued may be classified as a "foreign state" within the meaning of 28 U.S.C. § 1603 and thus invoke in any set of circumstances the protec-

1. The plaintiff argues that the Immunities Act, which "became effective only subsequent to the time this action was commenced and long after the accrual of plaintiff's causes of actions of claims," Memorandum 2, should not be applied to this case. This contention is without merit. The Supreme Court discussed the considerations which should weigh in an evaluation of the application of a new statute: " ' 'a retrospective operation will not be given to a statute which interferes with antecedent rights . . . unless such be "the unequivocal and inflexible import of the terms and the manifest intention of the legislature." ' " *Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964), *quoting Union Pac. R.R. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 58 L.Ed. 179 (1913). This Court concludes that applying the Immunities Act to the instant case will give effect to the congressional intent and will not interfere with the antecedent rights of the parties. The preamble to the statute itself states: "Claims of foreign states to immunity *should henceforth be decided* by courts of the United States and of the States in conformity with the principles set forth in this chapter." 28 U.S.C. § 1602 (emphasis added). Moreover, the Act does not purport to create new rights of immunity but to "codify the so-called 'restrictive' principle of sovereign immunity . . . [which] was adopted by the Department of State in 1952 and has been followed by the courts and the executive branch ever since." H.R.Rep.No.94–1487, 94th Cong. 2d Sess. 7, *reprinted in* [1976] *U.S.Code Cong. & Admin.News* 6604, 6605. Indeed, insofar as the Immunities Act alters the rights of parties, it does so by expanding the ability of plaintiffs to obtain satisfaction of judgments against foreign states. *Id.* at 8.

Finally, the Department of State itself, while not taking a position on the claims of sovereign immunity, has stated that it "concurs in the position taken by the attorneys for Novosti and TASS that the Foreign Sovereign Immunities Act applies in this case, even though the actions were commenced before January 21, 1977." Statement of Department of State, dated May 16, 1977, appended as Exhibit I to Reply Affidavit of Martin Popper, sworn to May 24, 1977.

tion of the Immunities Act. In this case both TASS and Novosti have claimed such protection.

### Status as a "Foreign State"

#### TASS

■ There seems to be little doubt concerning TASS's status. Anatoliy F. Dobrynin, the Ambassador of the U.S.S.R. to the United States, has certified to the Court that TASS, whose full name is the "Telegraph Agency of the Soviet Union of the USSR Council of Ministers," is "the organ of the Soviet State, that is of the Union of Soviet Socialist Republics." Certificate dated February 4, 1977. The plaintiff admits that TASS comes within the definition of "foreign state" in section 1603. Memorandum 4. Thus, there is no dispute: TASS is entitled to claim the protection of the Immunities Act.

#### Novosti

■ The plaintiff is unwilling, however, to concede the same status to Novosti. Novosti argues that it must be classified as an "agency or instrumentality of a foreign state" (and thus within the more general definition of "foreign state"), since it meets the three criteria set forth in section 1603(b). The plaintiff agrees on two of the three criteria: Novosti is "a separate legal person" within the meaning of section 1603(b)(1), since its "Statute" or charter clearly establishes its existence as a separate "juridical person" which opens bank accounts, acquires and alienates property and concludes contracts in its own name. Novosti Press Agency Statute ("Novosti Statute") § III(8), appended as Exhibit I to Affidavit of Martin Popper, sworn to March 14, 1977 ("Popper Affidavit"). The plaintiff also agrees that Novosti is not a citizen of any state of this country, as set forth in section 1603(b)(3). Thus, the dispute over the classification of Novosti must focus on the last of the three provisions, which requires that an "agency or instrumentality of a foreign state" be an entity

> which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . . . .

28 U.S.C. § 1603(b)(2).

Unfortunately, this definition, which seems designed to establish the degree of the foreign state's identification with the entity under consideration, is ill-suited to concepts which exist in socialist states such as the Soviet Union.

Novosti, as the Novosti Statute sets forth, is "an information agency of Soviet public organizations . . . operating under Articles 125 and 126 of the Constitution of the U.S.S.R." Novosti Statute § I(1). These constitutional articles guarantee freedom of the press to the citizens of the U.S.S.R. through their control of communications facilities (Art. 125) and also guarantee to the citizens "the right to unite in mass organizations" such as Novosti. (Art. 126). Novosti's organizational structure consists of three bodies of ascending size and descending responsibility which govern the organization. These bodies are made up of delegates elected from Novosti's "Sponsors": the Union of Journalists of the U.S.S.R., the Union of Writers of the U.S.S.R., the Union of Soviet Societies of Friendship and Cultural Relations with Foreign Countries and the U.S.S.R. Znanie Society. Novosti Statute § II(4). The stated purposes of Novosti include, *inter alia,* entering into contracts with foreign-owned media to supply them with Novosti material for an appropriate fee, *id.* § I(2)(b), and exchanging material with Soviet and foreign news agencies, organs of the press, publishing houses, and other agencies on the basis of reciprocity. *Id.* § I(2)(c).

In accomplishing these purposes Novosti is provided by the state with the free use of buildings and structures, transmission facilities, communications, furniture, and equipment worth a total of 2,941,500 roubles. Notarized Statement of L. Bogdanov, dated March 3, 1977 ("Bogdanov Statement"); Notarized Statement of I. Kolganov, dated May 24, 1977 ("Kolganov Statement"). This use is "in accordance with Article 6 of the Constitution of the USSR," *id.,* which states:

The land, its mineral wealth, waters, forests, the factories and mines, rail, water and air transport facilities, the banks, means of communication, large state-organised agricultural enterprises (state farms, machine and tractor stations, etc.), as well as municipal enterprises and the bulk of the dwelling-houses in the cities and industrial localities, are state property, that is, belong to the whole people.

At the same time, Novosti has "its own fixed assets," valued on January 1, 1977 at 1,719,600 roubles. Bogdanov Statement. The remaining property "provided for the Novosti Press Agency by the State" is leased from the state for a yearly rent of 460,000 roubles. Kolganov Statement. Novosti's relation to the state is further defined by its charter provision which states that "[n]o Soviet state organ bears responsibility for the business activities and financial obligations or any other actions of the Agency." Novosti Statute § III(10).

The plaintiff argues that this latter provision "conclusively shows" that Novosti is not an agency or instrumentality of the U.S.S.R. and contends that Novosti cannot "bootstrap the 'free use of real estate' into an 'ownership interest.'" Memorandum 6. Such arguments misconstrue the nature of legal, social and economic organization in the U.S.S.R., however. Admittedly, the Immunities Act, by phrasing its test for the involvement of a foreign state in an independent entity in terms of "ownership," does not simplify construction of the Act in its application to socialist entities. Harold J. Berman, in his book *Justice in the U.S.S.R.,* discusses this problem in the context of defining the nature of ownership in a "state economic enterprise":[2]

Ownership is defined in Soviet law, as in European law generally, as including the right of possession, use, and disposition of the thing which is owned. What the state owns it has the right to possess, use, and dispose of. But what a state economic enterprise possesses, uses, and disposes of—it does not own! May one speak, then, of a "right" of possession, use, and disposition in the state economic enterprise? Or does not the enterprise merely exercise certain economic-administrative functions delegated to it by the state?

H. Berman, *Justice in the U.S.S.R.* 115 (1963). The state economic enterprise, like the voluntary association, is self-administering, *id.* at 116, and is financially responsible for its obligations. *Id.* at 111. It is a juridical person, which, "having received from the State for its exclusive use both equipment and capital, proceeds to operate on its own, with its own financial accounting, bank account, credit facilities, and, finally, with the right to make a profit." *Id.* at 110. However, self-administration, while significant to the life of the enterprise, is not the same as ownership, as Berman points out:

Administration in the Soviet sense is not merely direction or supervision, but involves all aspects of control, including the realization of that control. *It is thus something less than ownership,* but something more than giving orders.

*Id.* at 116 (emphasis added).

Thus, if the concept of "ownership" is to be applied in this situation, it would have to

---

**2.** Novosti is not such a "state economic enterprise" but a voluntary association organized under Article 126 of the U.S.S.R. Constitution, as described above. Nevertheless, the two types of organizations seem to have many attributes in common, as described in the text. Furthermore, George C. Guins, in his book on the Soviet legal system, concludes that there is no real difference between the other economic enterprises and "voluntary associations" organized pursuant to Article 126:

Even the so-called voluntary associations, tradeunions, youth organizations, sport and defense clubs, cultural, technical, and scientific societies which, according to our usual conception must be the most independent in their activities, are in fact directed by the Communist Party and are, the same as all other entities, at the service of the state.

. . . . .

No matter to which group any legal entity belongs, it is always subject to government control and directives and performs special functions inspired by the highest organs of the state.

G. Guins, *Soviet Law and Soviet Society* 97 (1954) ("Guins").

be said that the state is the "owner" both of the state economic enterprise and of organizations such as Novosti. Guins, in describing all legal entities in the U.S.S.R. including voluntary associations organized under Article 126 of the Constitution of the U.S.S.R., states:

> With a few insignificant exceptions, the socialist state is the sole owner of all means of production and is a trade monopolist. It is evident that all legal entities in the Soviet Union are government enterprises though organized on a commercial basis. . . .

Guins, *supra* note 2, at 96.

Thus, whether one relies on the fact that more than 63% of the property over which Novosti exercises the rights of possession and use is actually "owned" by the state, or whether one looks to the essentially public nature of all organizations such as Novosti in the Soviet Union, one must conclude that Novosti is either an organ of the U.S.S.R. or "owned" by the U.S.S.R. or its political subdivisions. As Stalin stated,

> The foundation of our system is public ownership, just as the foundation of capitalism is private ownership. Whereas the capitalists have proclaimed private property rights to be sacred and inviolable, achieving in their time the strengthening of the capitalist system, we Communists have all the more reason to proclaim public ownership sacred and inviolable, so as to strengthen thereby the new socialist forms of economy in all fields of production and trade.

*Quoted in* Guins, *supra* note 2, at 106.[3]

Furthermore, the Court has before it Ambassador Dobrynin's statement that, at the time that it received notice of this action, "Novosti was an instrumentality of the Union of Soviet Socialist Republics" and that it continues to have "the same status at the present time." Claim of Sovereign Immunity by Ambassador Dobrynin, dated March

11, 1977, appended as Exhibit G to Popper Affidavit. The persuasive quality of such evidence was discussed in *Krajina v. The Tass Agency,* [1949] 2 All E.R. 274 (C.A.), in which the English Court of Appeal found TASS entitled to sovereign immunity largely on the statement of the Soviet Ambassador concerning the status of the agency under Soviet law. Two of the three judges found this evidence conclusive on the relation of TASS to the state, *id.* at 276 (Cohen, L.J.), 285 (Singleton, L.J.); the third stated that "the certificate of [the Soviet] ambassador in this country is not conclusive of the matter, though, no doubt, it is evidence of very high evidential value, and, in a matter of this kind, I think it is probably the best kind of evidence that can be procured." *Id.* at 281 (Tucker, L.J.). Thus, in sum, the Court concludes that Novosti fulfills all aspects of the definition of an "agency or instrumentality of a foreign state" set forth in 28 U.S.C. § 1603(b) and is thus entitled to invoke sovereign immunity in this Court.

*Immunity*

The validity of a claim of immunity is predicated, as was discussed above, upon the Court's classification of the cause of action alleged: if it comes within one of the exceptions to immunity set out in 28 U.S.C. § 1605, then immunity is not appropriate and the action must proceed. In the instant action, the plaintiff has alleged four acts of libel, two against Novosti and two against TASS. Specifically, Novosti is charged in the first and second causes of action with having written articles which allegedly defamed the plaintiff and with having caused those articles to be published in February 1976 in two periodicals, *Sowjetunion Heute* and *Krasnaya Zvezda,* both of which are alleged to be distributed in the United States. Similarly, TASS is said to have written two allegedly defamatory articles and caused them to be published in June 1976 in two other publications, *Izvestia* and

---

**3.** This principle is embodied in Article 4 of the Constitution of the U.S.S.R.:

> The economic foundation of the U.S.S.R. is the socialist system of economy and the socialist ownership of the instruments and

means of production, firmly established as a result of abolishing the capitalist system of economy, the private ownership of the instruments and means of production, and the exploitation of man by man.

*Sovietskaya Russiya,* likewise alleged to be circulated to the public in the United States.

█ Two provisions of section 1605 could be construed to apply to these causes of action. The first, subsection (a)(5), was intended to cover noncommercial torts which were not covered by the other subsection, (a)(2). H.R.Rep.No.94–1487, 94th Cong., 2d Sess. 20–21, *reprinted in* [1976] *U.S.Code Cong. & Admin.News* pp. 6604, 6619 ("House Report"). Application of this provision would be immediately fatal to the plaintiff's assertion of jurisdiction, however, for it specifically excludes (*i. e.,* reinstates a grant of immunity for) "any claim arising out of . . . libel." 28 U.S.C. § 1605(a)(5)(B). Thus, immunity must be granted to TASS and Novosti unless the Court finds that the acts alleged are within the scope of subsection (a)(2).

█ That subsection states that a foreign state shall not be immune in any case

in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . . .

The plaintiff seems to rely on the third of these three possible bases of jurisdiction—an act committed outside the United States which has a direct effect inside the United States. Memorandum 8. Indeed, that provision seems to be the only relevant basis. With respect to the first possible ground, this action is not based on any commercial activity carried on *inside* the United States by Novosti or TASS since the allegedly offending articles were published outside the country and sent into the United States by means wholly outside the control of either TASS or Novosti. Similarly, the second ground is inapposite since the "acts" alleged—the writing and publication of the articles—were not performed in the United States. The language of the third provision seems to track that of the complaint: acts performed outside the United States (here, writing and publication of the articles) which caused a direct effect in the United States (*e. g.,* injury to the good name and reputation of the plaintiff).

█ One essential requirement remains to be established however: the act must be "in connection with a commercial activity of the foreign state." 28 U.S.C. § 1605(a)(2). In attempting to demonstrate that this requirement has been fulfilled, the plaintiff cites section I(2) of the Novosti Statute, discussed above, as exhaustively listing Novosti's commercial activities. Thus, the plaintiff's argument in this regard seems to be based on the unstated premise that an entity which engages in commercial activity is a commercial *entity* and thus is not entitled to claim sovereign immunity. The Immunities Act does not embody such a principle, however. Rather, it clearly contemplates that a given entity may at some times engage in commercial activities, on which it would not be immune, and at other times take actions "whose essential nature is public or governmental," on which it would be immune. *See* House Report 16. For example, a foreign government, otherwise clearly entitled to immunity, would lose that immunity with respect to its sale of a product to an American citizen. *See id.* Thus, the inquiry under subsection (a)(2) must focus on the specific activity at issue and determine whether it may be characterized as "commercial."

The Immunities Act states that the term "commercial activity" means

either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). The House Report amplifies this definition: "commercial activity" encompasses

a broad spectrum of endeavor, from an individual commercial transaction or act to a regular course of commercial conduct. A "regular course of commercial conduct" includes the carrying on of a commercial enterprise such as a mineral extraction company, an airline or a state trading corporation. Certainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed. At the other end of the spectrum, a single contract, if of the same character as a contract which might be made by a private person, could constitute a "particular transaction or act." House Report 16; U.S.Code Cong. & Admin.News 1976, p. 6614. As the Report goes on to state, "it is the essentially commercial nature of an activity or transaction that is critical." *Id.;* U.S.Code Cong. & Admin.News 1976, p. 6615.

■ There is no doubt that Novosti does engage in commercial activity. For example, it sells articles to foreign media.[4] The relevant issue in this case, however, is not whether Novosti or TASS engage in commercial activities but whether their alleged libels were "in connection with a commercial activity." The Court concludes that they were not.

The four publications in which the alleged libels appeared are all publications of the U.S.S.R. itself. The masthead of *Sowjetunion Heute* identifies its publisher as "Press Department of the Embassy of the U.S.S.R. [in West Germany] in collaboration with the press agency Nowosti." Popper Affidavit Exh. A (as translated). *Krasnaya Zvezda* is identified as the "Central Organ of the Ministry of Defense of the USSR." *Id.* Exh. B (as translated). *Izvestia,* somewhat better known in the West, is identified as the "Organ of the Soviets of Working People's Deputies," published by "The Presidium of the Supreme Soviet of the USSR." *Id.* Exh. C (as translated). Final-

ly, *Sovetskaya Rossiya* (or *Russiya*) describes itself as the "Organ of the Central Committee of the Communist Party of the Soviet Union, The Supreme Soviet of the Russian Federative Socialist Republic [RSFSR] and the Council of Ministers of the RSFSR." *Id.* Exh. D (as translated). Thus, by collaborating in the publication of stories in these journals, Novosti, as well as TASS, was engaged not in "commercial activity" but in acts of intra-governmental cooperation of a type which apparently constitutes much of Novosti's (and presumably more of TASS's) activity. *See* Novosti Statute § I(2)(c). Such action was not in connection with a contract or other arrangement with a nongovernmental or foreign party, which activity would be found commercial under most circumstances. Rather, it was one instance of a cooperative arrangement with a governmental agency and thus cannot be characterized either as "a regular course of commercial conduct" or as "a particular commercial transaction or act." 28 U.S.C. § 1603(d).

Furthermore, the net result of this cooperative relationship was the publication of articles which, under the circumstances, must be regarded as official commentary of the Soviet government. Whether or not the Court admires the tone of such commentary, it cannot be gainsaid that it constitutes "an activity whose essential nature is public or governmental." To reach around the various organs of the Soviet government which actually published the alleged libels and subject to this Court's jurisdiction a news agency whose ownership by and identification with the Soviet state has been demonstrated, as in the case of Novosti, or admitted, as with TASS, would contravene the spirit of sovereign immunity as well as the letter of the Immunities Act.

The Court therefore concludes that Novosti and TASS are immune under the Immunities Act from this Court's jurisdiction

---

**4.** There was no similar evidence presented with respect to TASS's activities, although a TASS statute, which appears to resemble that of Novosti, seems to exist. *See Krajina v. The Tass Agency, supra,* [1949] 2 All E.R. at 276–77 (Cohen, L.J.). For the purposes of this discus-

sion, however, it is irrelevant whether either TASS or Novosti engages in some or even substantial commercial activity since the Court concludes that the acts alleged to have injured the plaintiff in this case were not performed in connection with a commercial activity.

on the claims alleged against them by the plaintiff in this action. Accordingly, the complaint is dismissed as against Novosti and TASS.

So ordered.