BIO/BASICS INTERNATIONAL CORPORATION, Plaintiff,

v.

ORTHO PHARMACEUTICAL CORPORATION, Defendant.

No. 81 Civ. 4294(RJW).

United States District Court, S. D. New York.

Aug. 23, 1982.

Rochman, Platzer & Fallick, New York City, for plaintiff; Barry M. Fallick, Sam Rosmarin, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, Johnson & Johnson, Inc., New Brunswick, N. J., for defendant; Frederick T. Davis, New York City, James E. Farrell, Jr., New Brunswick, N. J., of counsel.

ROBERT J. WARD, District Judge.

The complaint filed in this diversity action sets forth six causes of action: two for tortious interference with contract; two for tortious interference with precontractual relations; one for breach of fiduciary relationship; and one for defamation. Plaintiff is Bio/Basics International Corporation ("Bio/Basics"), a New York corporation. Defendant is Ortho Pharmaceutical Corporation ("Ortho"), a New Jersey corporation. All six causes of action set forth in the complaint are based on certain statements made by an Ortho employee during his testimony before a United States Senate Subcommittee. Ortho now moves, pursuant to Rule 56, Fed.R.Civ.P., for an order granting summary judgment in its favor and dismissing the complaint. For the reasons hereinafter stated, Ortho's motion is granted.

I

The factual allegations of plaintiff's complaint, which the Court deems to be true for the purposes of deciding defendant's summary judgment motion, may be summarized as follows. Ortho is a subsidiary of Johnson & Johnson, Inc., and is primarily engaged in the manufacture, distribution, and sale of pharmaceutical and medical products. Bio/Basics is a medical research and clinical product development organization. At the time it commenced this action, it had been in business for about eight years. Bio/Basics devotes its activities in large part to matters undertaken on behalf of companies, such as Ortho, that manufacture pharmaceutical products. Among other things, Bio/Basics offers its clients assistance in the testing of new therapeutic substances. The services that Bio/Basics customarily makes available to a client for this purpose include: (1) locating "clinical investigators" who are qualified and willing to engage in testing new therapeutic substances; (2) furnishing administrative services necessary for such testing to be conducted; (3) forwarding the results of such testing to the client, that is, to the manufacturer of the substance being tested; and (4) communicating and consulting with the client on various matters relating to such testing.

Beginning in September 1975, Ortho and Bio/Basics entered into a series of contracts whereby Bio/Basics agreed to retain the clinical investigators necessary to conduct studies relating to the safety and efficacy in humans of a drug known as "suprofen." Suprofen is a non-narcotic analgesic agent designed to relieve mild to moderate pain. In these contracts, Bio/Basics further agreed to retain a group of recognized academic experts to conduct a "peer group review" of the studies of suprofen that were to be performed by the clinical investigators. The "clinical investigation" and "peer group review" that Bio/Basics agreed to conduct on Ortho's behalf were undertaken for the purpose of supporting a "New Drug Application" ("NDA") that Ortho intended to file with the Food and Drug Administration ("FDA") in order to gain FDA approval of suprofen for marketing to the general public in the United States. Bio/Basics alleges that it fully and properly performed all of its obligations under these contracts.

On October 11, 1979, George A. Braun, Ortho's Vice-President for Scientific Affairs, appeared before the Subcommittee on Health and Scientific Research of the Committee on Labor and Human Resources of the United States Senate ("the Senate Subcommittee"), which was at that time conducting hearings on fraud and abuse in the testing of new drugs on human subjects. While Braun had not been subpoenaed to testify, his appearance was pursuant to the Senate Subcommittee's specific request that someone from Ortho provide information about the clinical studies conducted on su-

profen for Ortho by Bio/Basics. Braun's testimony consisted of a prepared statement, which he read into the record with the permission of Senator Edward M. Kennedy, Chairman of the Senate Subcommittee, and also of answers to certain questions posed by Senator Kennedy. In his prepared statement, Braun first described the aforementioned contractual relationship between Ortho and Bio/Basics. He then told the Senate Subcommittee that the clinical studies of suprofen contemplated by the Ortho-Bio/Basics contracts had been completed by late 1977 and that Ortho had filed its NDA for suprofen in October 1978. According to Braun, the FDA, in the course of processing Ortho's NDA for suprofen, reviewed the data submitted by certain of the clinical investigators retained by Bio/Basics and advised Ortho that the data might be "worthless." Ortho responded to its receipt of this information, said Braun, by commencing a complete review of all the documents relating to the Bio/Basics study of suprofen. Braun's statement then asserted that Ortho's review of Bio/Basics' suprofen study showed that the "peer group review" contemplated by the contracts with Bio/Basics "had not been utilized as originally anticipated," and that "data from many of the [Bio/Basics] studies [were] not usable or [were] usable only to a limited extent."

Bio/Basics responded to Braun's testimony before the Senate Subcommittee by commencing this lawsuit. According to the complaint, Braun's statement to the Senate Subcommittee contained false and misleading information and was made by Braun with the knowledge that it contained such information and with the intent of injuring Bio/Basics. Several existing and potential clients of Bio/Basics, located in various states of the United States, including New York, learned of Braun's statement to the Senate Subcommittee. As a direct result of Braun's statement, two clients of Bio/Basics, including one client located in New York, terminated their contracts with Bio/Basics, and two potential clients of Bio/Basics, one of which was located in New York, terminated their precontractual relations with Bio/Basics. The complaint alleges that Braun knew of these contractual and precontractual relationships when he made his statement to the Senate Subcommittee and that his statement was intended to interfere with those relationships. Accordingly, the complaint alleges that, by virtue of Braun's statement, Ortho tortiously interfered with contractual relations between Bio/Basics and its clients, tortiously interfered with precontractual relations between Bio/Basics and its potential clients, committed a breach of the fiduciary relationship between Bio/Basics and Ortho, and defamed Bio/Basics.

Ortho now moves, pursuant to Rule 56, Fed.R.Civ.P., for an order granting summary judgment in its favor on all six claims set forth in the complaint. In support of its motion, Ortho relies primarily [1]

---

**1.** Ortho also contends that it is entitled to summary judgment because (1) all of plaintiff's six causes of action are barred by the applicable statute of limitations, and (2) the statements that are the basis for each of plaintiff's six causes of action qualify for the "common-interest privilege." The Court finds neither argument persuasive. As regards the statute of limitations argument, the Court observes that this action was commenced on July 10, 1981, approximately twenty-one months after the cause of action accrued on October 11, 1979. Thus, while plaintiff's action is time barred insofar as it states a claim for defamation, see N.Y.Civ.Prac.Law § 215.3 (imposing one-year period of limitation on defamation actions), or could be interpreted to state a claim for prima facie tort, see Milone v. Jacobson, 78 A.D.2d 548, 549, 432 N.Y.S.2d 30, 31 (2d Dep't 1980)

(allegations sounding in defamation may not be labeled as stating a claim in prima facie tort and thereby avoid one-year period of limitation for defamation actions), it is not time barred insofar as it states claims for tortious interference with contractual and precontractual relations and breach of fiduciary duty. See Frigi-Griffin, Inc. v. Leeds, 52 A.D.2d 805, 806 & n.2, 383 N.Y.S.2d 339, 341 & n.** (1st Dep't 1976) (applying three-year period of N.Y.Civ.Prac.Law § 214 to test timeliness of claim for tortious interference with contractual relations and six-year period of N.Y.Civ.Prac.Law § 213 to test timeliness of claim for breach of fiduciary duty). The Court recognizes that there is broad language in some New York cases indicating that a one-year period of limitation should be used to test the timeliness of a tortious interference claim whenever the com-

on the legal proposition that it is entitled to be found absolutely immune from suit with respect to each of plaintiff's six causes of action. Having set forth the necessary factual background, the Court now proceeds to analyze the legal merit of Ortho's immunity argument.

## II

The briefs filed with the Court in this case disclose a vigorous dispute between the parties regarding the extent to which New York law immunizes a witness who appears before a legislative committee from a subsequent lawsuit based on his or her testimony to the committee. Plainly, this question of New York law is only controlling here if the immunity issue presented by this case is governed by New York law. Thus, the Court's first task is to decide what body of law governs the immunity of a witness who testifies before a federal legislative committee such as the Senate Subcommittee.

## A

The Court begins by considering the applicability of federal law. To be sure, there is no federal constitutional or federal statutory provision setting forth the extent to which a witness who appears before a federal legislative committee is immune from a subsequent lawsuit based upon his or her testimony to the committee. *Cf. Hutchinson v. Proxmire*, 443 U.S. 111, 123–33, 99 S.Ct. 2675, 2682–87, 61 L.Ed.2d 411 (1979) (delineating scope of defamation immunity afforded members of Congress by "speech or debate clause," U.S.Const. art. I, § 6); *Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849, 854–57 (S.D.N.Y.1978) (delineating scope of defamation immunity afforded foreign states by Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)). However, federal law would govern the immunity issue raised in this case, notwithstanding the absence of a controlling constitutional or congressional directive, if the facts of this case present one of the "few and restricted" instances, *see Wheeldin v. Wheeler*, 373 U.S. 647, 651, 83 S.Ct. 1441, 1444, 10 L.Ed.2d 605 (1963), where the courts are permitted to fashion and apply "federal common law" as the rule of decision.[2]

plaint alleges facts that would have supported a defamation claim. *See, e.g., Kartiganer Associates, P. C. v. Town of Newburgh*, 57 A.D.2d 857, 858, 394 N.Y.S.2d 262, 263 (2d Dep't 1977); *Noel v. Interboro Mutual Indemnity Insurance Co.*, 31 A.D.2d 54, 55, 295 N.Y.S.2d 399, 400 (1st Dep't 1968), *aff'd*, 29 N.Y.2d 743, 326 N.Y.S.2d 396, 276 N.E.2d 232 (1971). It appears, however, that this rule is only applied where the plaintiff, in addition to alleging facts that would have supported a defamation claim, has also failed to allege the elements of a tortious interference claim, thereby permitting an inference that the plaintiff used the tortious interference label simply as a vehicle to avoid application of the one-year period of limitation that governs defamation actions. *See Rupert v. Sellers*, 65 A.D.2d 473, 485–86, 411 N.Y.S.2d 75, 83 (4th Dep't 1978) (Cardamone, J., concurring), *aff'd*, 50 N.Y.2d 881, 430 N.Y.S.2d 263, 408 N.E.2d 671, *cert. denied*, 449 U.S. 901, 101 S.Ct. 272, 66 L.Ed.2d 132 (1980); *Mishkin v. Dormer*, 57 A.D.2d 795, 795–96, 395 N.Y.S.2d 452, 453 (1st Dep't 1977). Here, plaintiff has alleged (1) the existence of certain contracts and precontractual relations, (2) Ortho's knowledge of these contracts and precontractual relations, (3) Ortho's deliberate procurement of the breach of the contracts and the termination of the precontractual relations, and (4) damages resulting from Ortho's conduct. These allegations state paradigmatic tortious interference claims, *see Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99 (1956), and thus permit the timeliness of those claims to be tested by the normal three-year period of limitation.

As regards Ortho's claim that the "common-interest privilege" is available, the Court observes that this privilege is only a qualified privilege, being unavailable where the defendant is found to have acted with malice. *Brennan v. Granite Equipment Leasing Corp.*, 60 A.D.2d 877, 878, 401 N.Y.S.2d 275, 277 (2d Dep't 1978); *see Restatement (Second) of the Law of Torts* § 596 (1976). Here, plaintiff has alleged that Braun's statements to the Senate Subcommittee were made maliciously. Accordingly, summary judgment may not be granted in Ortho's favor on this theory.

**2.** The Court has found no case ruling whether federal common law governs the state-tort-law immunity of a witness who testifies before a federal legislative committee. Indeed, it has found no state or federal case where, as here, a witness's testimony before a *federal* legislative committee was the subject of a lawsuit based on a state law theory. Thus, the question whether federal law governs the immunity is-

The situations where federal common law may be developed fall into essentially two categories: (1) those in which Congress has given the courts the power to develop substantive law, and (2) those in which a federal rule of decision is necessary to protect uniquely federal interests. *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981).[3] The immunity issue raised by this case clearly does not fall in the first of these categories. This category of cases refers to situations where the court fashions federal common law in order to supplement a federal statutory program that itself embodies congressional policy determinations. *In re Agent Orange Product Liability Litigation*, 635 F.2d 987, 995 (2d Cir. 1980), *cert. denied,* —— U.S. ——, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *see, e.g., Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–918, 1 L.Ed.2d 972 (1957); *Owens v. Haas*, 601 F.2d 1242, 1248 (2d Cir.), *cert. denied*, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Ivy Broadcasting Co. v. American Telephone & Telegraph Co.*, 391 F.2d 486, 491 (2d Cir. 1968). The instant case might fall in this category,

then, if Congress had, without treating the precise immunity issue raised here, either enacted a federal defamation statute or granted the federal courts original jurisdiction of any action that seeks to recover damages caused by the testimony of a witness who appeared before a federally created body. However, since there has been no congressional enactment of this sort, the first category of federal-common-law cases cannot possibly be stretched to cover this case.

After careful consideration, the Court has concluded that this case is not covered by the second category noted above either. The second category of federal-common-law cases refers to those situations where federal common law is fashioned because the court identifies a particular federal policy or interest that is implicated by an issue raised in the case before it, and perceives a significant conflict between that policy or interest and the use of state law as the rule of decision. *City of Milwaukee v. Illinois*, 451 U.S. 304, 313, 101 S.Ct. 1784, 1790, 68 L.Ed.2d 114 (1981); *Miree v. DeKalb County*, 433 U.S. 25, 31, 97 S.Ct. 2490, 2494, 53

sue presented by this case is truly one of first impression. However, the Court of Appeals for this Circuit considered a closely analogous case in *King v. Hildebrandt*, 331 F.2d 476 (2d Cir. 1964). There, the defendant had testified, by way of affidavit, in a lunacy proceeding that had been commenced against the plaintiff in the United States District Court for the District of Columbia. The plaintiff, alleging that the affidavit was libelous, brought a diversity action in the United States District Court for the Southern District of New York. Both the district court, *see* 216 F.Supp. 814 at 816, and the court of appeals, *see* 331 F.2d at 478, held that the defendant's immunity defense was governed by "the law of the District of Columbia." The significance of this holding to the Court's adjudication of the instant case is rather uncertain, because the *King v. Hildebrandt* court, in choosing to apply District of Columbia law, mentioned only New York law as a possible alternative and did not expressly deal with the possibility of applying federal common law. However, if the *King v. Hildebrandt* court did intend to hold that state rather than federal law governs the state-tort-law immunity of a witness who testifies before a federal court, it would follow that state law governs the state-tort-law immunity of a witness who testifies before a federal legislative committee.

3. The Court observes in passing that, were it to hold that Ortho's immunity from suit is to be decided by reference to federal common law, it would do no violence to the rule of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Once it has been determined that federal common law governs a particular issue, federal common law supplies the rule of decision regardless of whether the issue turns up in a diversity action and regardless of whether the issue is susceptible of being characterized as "substantive" within the meaning of *Erie*. C. Wright, *Handbook on the Law of Federal Courts*, 285 (3d ed. 1976); *see, e.g., Francis v. Southern Pacific Co.*, 333 U.S. 445, 450, 68 S.Ct. 611, 613, 92 L.Ed. 798 (1948). The reasoning behind this proposition is simple enough: since federal common law is binding on both federal and state courts, *see, e.g., Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 102–04, 82 S.Ct. 571, 576–577, 7 L.Ed.2d 593 (1962), a federal court hearing a diversity case acts "only [as] another court of the State," *see Guaranty Trust Co. v. York*, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945), and thus does not transgress *Erie's* basic premise, when it applies federal common law to adjudicate a particular issue presented by the case.

L.Ed.2d 557 (1977). In cases where the United States is a party or where its rights and duties are directly implicated, such a conflict is often easily found: the use of state law as the rule of decision in such cases would conflict with the federal government's interest in having uniform rules govern its rights and obligations. *In re Agent Orange Product Liability Litigation, supra*, 635 F.2d at 993; *see, e.g., United States v. Standard Oil Co.*, 332 U.S. 301, 305, 67 S.Ct. 1604, 1606, 91 L.Ed. 2067 (1947); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943). Even where the litigation does not directly implicate the rights and duties of the United States, meaning that there is no paramount federal interest in uniformity for its own sake, the requisite conflict may be found by virtue of the existence of an identifiable *substantive* federal policy that creates a federal interest in a particular outcome different from the result that would pertain were state law applied. *In re Agent Orange Product Liability Litigation, supra*, 635 F.2d at 993–94; *see, e.g., Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6, 92 S.Ct. 1385, 1393 n.6, 31 L.Ed.2d 712 (1972).

The instant action is not a case involving the United States as a party or directly implicating its rights and duties. Thus, this is not a case where the requisite foundation for the creation of federal common law exists simply because of the status of the parties. *Cf. Howard v. Lyons*, 360 U.S. 593, 597, 79 S.Ct. 1331, 1333, 3 L.Ed.2d 1454 (1959) (holding that federal common law governs immunity of federal employees in defamation actions that challenge statements made by such employees in the course of their duties). Nonetheless, there is undeniably a federal interest in enabling witnesses who appear before federal legislative committees to know in advance the likelihood that their testimony will cause them to be subjected to tort liability. The Court, having carefully considered the relevant case law, has determined that this federal interest in uniformity and predictability of result is insufficiently paramount to provide a basis for the creation of federal

common law. In *In re Agent Orange Product Liability Litigation, supra*, the Court of Appeals for this Circuit held that the federal interest in uniform treatment of veterans' claims against private United States companies for injuries suffered while serving in the United States military was, by itself, insufficient to justify the creation of federal common law. 635 F.2d at 993–94. Plainly, if an insufficient predicate for the development of federal common law inheres in the federal interest that the legal consequences of service in the United States military be uniform, no sufficient basis for creating federal common law exists simply by virtue of the federal interest that the legal consequences of service as a witness before a congressional committee be uniform.

■ As noted, even where the federal interest in a uniform rule is itself insufficient to trigger the creation of federal common law, federal common law may be developed where (1) the legal issue before the court implicates an identifiable *substantive* federal policy that supports a rule having a particular substantive content, and (2) application of state law would conflict with that policy. The first prong of this test has not been satisfied here, however, because the Court has been unable to identify a *particular* substantive federal policy that is implicated by the immunity issue raised in this case. The immunity of a witness who appears before a legislative committee must be determined by striking a policy balance between (1) a concern not to impinge on the effectiveness of the committee's work by discouraging the witness from giving full and frank testimony and (2) a desire not to allow the witness to use the committee as a vehicle to injure an innocent third party. In a case involving testimony before a federal legislative committee, then, the federal government has two substantive interests that are in direct conflict with one another. Accordingly, the question of the immunity that should be accorded a witness who testifies before a federal legislative committee does not implicate an *identifiable* substantive federal policy that the federal judiciary can serve by creating a *particular* substan-

tive rule of federal common law; rather, it raises two conflicting federal interests that require an independent policy determination for their resolution. Such an independent policy determination is, absent a paramount federal interest in a uniform rule of law, not to be made by a federal district judge through the creation of federal common law. *See generally In re Agent Orange Product Liability Litigation, supra,* 635 F.2d at 994–95.[4]

## B

■■■ Having determined that the immunity issue presented by this case is governed by state rather than federal law, the Court must now determine whether the applicable state law is that of the District of Columbia (as the situs of the allegedly defamatory statement) or of the State of New York (as the jurisdiction where Bio/Basics has its principal place of business and where some existing and potential Bio/Basics clients learned of the allegedly defamatory statement). In deciding this question, the Court is required to apply the choice-of-law rules of New York, the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Under New York choice-of-law principles, the substantive law to be applied to decide an issue arising in a tort case is the law of the jurisdiction having the most significant relationship with the issue. *Nader v. General Motors Corp.,* 25 N.Y.2d 560, 565, 307 N.Y. S.2d 647, 651, 255 N.E.2d 765, 768 (1970); *see Restatement (Second) of the Conflict of Laws* § 145 (1971). The New York courts have, in dealing with choice-of-law questions that arise in the context of defamation actions, generally fleshed out the case-by-case balancing test embodied in section 145 of the *Restatement* and endorsed in *Nader* by adopting the subsidiary rules that

the *Restatement* sets forth for defamation actions. *See, e.g., Rudin v. Dow Jones & Co.,* 510 F.Supp. 210, 216 (S.D.N.Y.1981). Under the *Restatement,* this action is a "multistate" defamation action, because it is based on an allegedly defamatory statement that was "published" (*i.e.,* communicated to third parties) in more than one state. *See Restatement (Second) of the Conflict of Laws* § 150 (1971). Where, as here, a multistate defamation action is brought by a corporation, the legal issues raised by the case are *generally* governed by the law of the state where the corporation has its principal place of business, as long as that state is also one of the states where the allegedly defamatory statement was published. *Id.* § 150(3). Thus, since the potential and existing Bio/Basics clients who learned of Braun's testimony before the Senate Subcommittee were located, among other places, in New York (the state of Bio/Basics' principal place of business), section 150(3) of the *Restatement* provides an arguable basis for the application of New York law to the immunity issue raised by this case.

However, while most issues arising in a multistate defamation action must, under section 150(3) of the *Restatement,* be decided by reference to the law of the state of the plaintiff's principal place of business if publication occurred in that state, this rule does not, in the Court's view, extend to the issue of whether the defendant who made the challenged statement is entitled to immunity. This particular issue strongly implicates not only the interests of the state where plaintiff has its principal place of business and where publication occurred, but also the interests of the state where the allegedly defamatory statement was made. That is, while the state where the plaintiff's business is principally located and where

---

4.  The Court pauses to observe that the second prong of the test set forth above has not been satisfied here either. Since this is a case where the Court cannot identify a particular federal policy, but only a particular federal policy question, it is plainly impossible for the Court to consider whether any particular federal policy would be undermined were state law applied to determine Ortho's immunity. The absence of any demonstrable conflict between an identifiable federal policy and the result that would pertain were state law applied stands as an additional impediment to the creation of federal common law in order to decide the immunity question raised by this case.

publication occurred can powerfully argue that its concern to strike a balance between protecting the plaintiff's reputation and encouraging free expression should entitle it to prescribe the controlling rule of law, the state where the defendant made the allegedly defamatory statement can contend, often with equal or greater force, that its law should provide the rule of decision, in order to accommodate its interest in affording the defendant assurance that certain statements will invariably be immune from a defamation challenge. *The Choice of Law in Multistate Defamation—A Functional Approach,* 77 Harv.L.Rev. 1463, 1482–83 (1964). *See also Restatement of the Conflict of Laws* § 382(2) (1934) ("[a] person who acts pursuant to a privilege conferred by the law of the place of acting will not be held liable for the results of his act in another state"). Thus, while it recognizes that there is no New York case holding to this effect,[5] the Court concludes that a New York court faced with an immunity defense raised in the context of a multistate defamation action brought by a corporation would determine the law applicable to that defense not by employing general rule set forth in section 150(3) of the *Restatement,* but rather by utilizing the case-by-case approach enunciated in section 145 of the *Restatement. See Restatement (Second) of the Conflict of Laws* § 163 (1971) (requiring application of section 145 to determine whether tort defendant is excused from liability by reason of privilege or immunity).

■ While in many cases application of the approach set forth above will require a court to strike a close balance between the competing interests of two or more states, the peculiar facts of the instant case make it fairly easy for the Court to determine which state has the "most significant relationship" to the immunity issue presented here. While both New York and the District of Columbia have an interest in providing the governing law because of their relationship to the challenged conduct, their interests are not of comparable significance. New York's interest in having its law govern the immunity question is powerful indeed, for New York is not only where publication of the allegedly defamatory statement occurred, in part, but also where Bio/Basics, the alleged injured party, has its principal place of business. On the other hand, since Braun's allegedly defamatory testimony was given before a *federal* legislative committee, rather than a legislative committee constituted pursuant to the laws of the District of Columbia, the interest of the District of Columbia in having *its* law govern the immunity question is minimal, at best, notwithstanding the fact that the challenged conduct was performed there. Thus, given the strength of New York's interest in the issue and the weakness of the District of Columbia's interest, the Court concludes that the question of Ortho's immunity from a lawsuit based on Braun's testimony before the Senate Subcommittee should be decided by reference to New York law.

### III

■ The courts of many states have adopted a general rule that a witness who appears before a legislative committee is absolutely immune from a lawsuit predicated on the testimony that the witness gave to the committee. *Restatement (Second) of the Law of Torts* § 590A (1976); *see, e.g., Scott v. McDonnell Douglas Corp.,* 37 Cal. App.3d 277, 285–86, 112 Cal.Rptr. 609, 614–15 (1974); *Farish v. Wakeman,* 385 So.2d 2, 2 (Fla.Dist.Ct.App.), *appeal dismissed,* 394 So.2d 1151 (Fla.1980); *Tocco v. Piersante,*

---

**5.** Indeed, while there are numerous cases from New York and elsewhere that discuss the application of modern choice-of-law methodology in the context of a defamation action, only a very few have involved an issue of privilege or immunity, *see, e.g., Jiminez v. Maritime Overseas Corp.,* 360 F.Supp. 142, 144 (S.D.N.Y.1973), and none has separated the inquiry required to determine the law governing the immunity issue from the inquiry required to ascertain the law applicable to the other issues involved in the case. Such an issue-by-issue approach to choice-of-law problems is, of course, one of the fundamental principles of modern choice-of-law methodology. *See Restatement (Second) of the Conflict of Laws* § 145, comment d (1971).

69 Mich.App. 616, 245 N.W.2d 356, 362 (1976); *Jennings v. Cronin*, 256 Pa.Super. 398, 389 A.2d 1183, 1185 (1978); *Logan's Super Markets, Inc. v. McCalla*, 208 Tenn. 68, 343 S.W.2d 892, 894 (1961). While there is no New York case directly on point, the decided cases strongly indicate that a New York court would confer absolute immunity on a defendant sued because of his or her testimony before a legislative committee. *See, e.g., Julien J. Studley, Inc. v. Lefrak*, 50 A.D.2d 162, 164–65, 376 N.Y.S.2d 200, 203–04 (2d Dep't 1975) (rule of absolute immunity protects testimony given to state licensing agency), *aff'd*, 41 N.Y.2d 881, 393 N.Y.S.2d 980, 362 N.E.2d 611 (1977); *Loudin v. Mohawk Airlines, Inc.*, 44 Misc.2d 926, 927–28, 255 N.Y.S.2d 302, 303–04 (Sup.Ct.N.Y.Co.1964) (rule of absolute immunity protects testimony given to Civil Aeronautics Board), *aff'd in relevant part*, 24 A.D.2d 447, 447, 260 N.Y.S.2d 899, 900 (1st Dep't 1965). Accordingly, the Court holds, as a matter of New York law and subject to the exceptions discussed *infra*, that a witness who appears before a legislative committee is absolutely immune from a lawsuit predicated on the testimony that the witness gave to the committee.[6] Since all six of the claims set forth in plaintiff's complaint are concededly predicated in their entirety on the testimony that Braun gave to the Senate Subcommittee, *see* Plaintiff's Statement Pursuant to Local General Rule 9(g) [sic], Mar. 23, 1982, at ¶¶ 1–5; *cf. Loudin v. Mohawk Airlines Inc., supra*, 44 Misc.2d at 928, 255 N.Y.S.2d at 304 (rule of absolute immunity is inapplicable where, unlike the case here, statements before the Civil Aeronautics Board were subsequently reiterated in a private, non-testimonial context, causing plaintiff to suffer harm distinct from the harm caused by the original statements to the Civil Aeronautics Board), *rev'd on other grounds*, 24 A.D.2d 447, 447, 260 N.Y.S.2d 899, 900 (1st Dep't 1965), Ortho is entitled to be found immune with respect to each of these claims unless an exception to the general rule of absolute immunity applies.

The courts have generally recognized that the absolute immunity of a witness who appears before a legislative committee should not extend to statements bearing no relation to the proceedings of the committee. *Restatement (Second) of the Law of Torts* § 590A (1976); 50 Am.Jur.2d *Libel and Slander* § 223 (1970); 53 C.J.S. *Libel and Slander* § 105 (1948); *see, e.g., Kelly v. Daro*, 47 Cal.App.2d 418, 118 P.2d 37, 40 (1941); *Logan's Super Markets, Inc. v.*

---

**6.** One court has recently opined, without any citation to authority or persuasive analysis, that this rule of absolute immunity should shield a witness who appears before a legislative body from a subsequent claim of defamation, but not from liability under business-tort principles. *Domestic Linen Supply & Laundry Co. v. Stone*, 111 Mich.App. 827, 314 N.W.2d 773, 778 (1981). In explaining its holding, the *Domestic Linen* court reasoned simply that "[t]he broad defense of absolute privilege in legislative affairs grew out of the common law immunity from actions in defamation," whereas "[t]he business torts, for which entirely different causes of action exist, carry with them their own defenses." 314 N.W.2d at 778. In the Court's view, this analysis provides no persuasive justification for declining to carry the traditional rule of absolute immunity over to the business-tort context from the defamation context. Indeed, when one recalls that a business defamation such as allegedly occurred here was actionable at common law without proof either that the plaintiff suffered damages or that the defendant was at fault, *see* W. Prosser, *Handbook of the Law of Torts*, 757–59, 771–74 (4th ed. 1971), and contrasts that standard with the strict limitations that have traditionally been imposed on the business-tort causes of action, *see Israel v. Wood Dolson Co., supra* note 1, it is apparent that the law has consistently protected the reputational interests served by the law of defamation with greater vigor than the purely economic interests that underlie such business torts as tortious interference with contract or tortious interference with precontractual relations. Under these circumstances, it is plain that a rule immunizing a defendant against a defamation action based on his or her statements before a legislative committee should *a fortiori* immunize that defendant against a business-tort action based on the same statements. In this Court's view, then, the rule enunciated in *Domestic Linen* is unsound and would not be followed by a New York court. Rather, a New York court would, upon finding Ortho entitled to absolute immunity with respect to plaintiff's defamation claim, recognize that plaintiff's business-tort claims are entirely predicated on the statements that are the basis for plaintiff's defamation claim and hold that the rule of absolute immunity bars plaintiff's business-tort claims as well.

*McCalla, supra,* 343 S.W.2d at 894. Since this exception is supported by sound policy considerations, *see* W. Prosser, *Handbook of the Law of Torts* 778–79 (4th ed. 1971), the Court believes that it would be adopted by a New York court in an appropriate case. *Cf. Wolf v. Musnick,* 84 A.D.2d 503, 503, 443 N.Y.S.2d 230, 231 (1st Dep't 1981) (holding that a witness who testifies before a judicial proceeding is entitled to immunity only if "the [challenged] statements [were] material or pertinent to the issues"). However, since the testimony at issue here concededly related to the subject matter of the Senate Subcommittee's inquiry, *see* Defendant's Statement Pursuant to Local Civil Rule 3(g), Mar. 2, 1982, at ¶ 3, this exception has no applicability to the instant case.

One court has held that the rule of absolute immunity should not apply where the defendant was not subpoenaed to testify before the legislative committee. *Fiore v. Rogero,* 144 So.2d 99, 103 (Fla.Dist.Ct.App. 1962). To be sure, the policy considerations that support a rule granting absolute immunity to a witness who appears before a legislative committee are most strongly presented where the committee was empowered to compel the witness to testify. *See Restatement (Second) of the Law of Torts* § 588, comment a (1976) ("[t]he compulsory attendance of all witnesses in judicial proceedings makes the protection [of absolute immunity] the more necessary").[7] However, if absolute immunity were afforded only to those witnesses who refused to testify before a legislative committee unless subpoenaed, potential witnesses would be discouraged from voluntarily cooperating with the committee. *See Jennings v. Cronin, supra,* 389 A.2d at 1185 n.2. The Court therefore believes that a New York court would confer absolute immunity upon any witness who appears before a legislative committee having the subpoena power, and not merely upon witnesses who force the committee to exercise that power. *See Loudin v. Mohawk Airlines, Inc., supra,*

44 Misc.2d at 927–28, 255 N.Y.S.2d at 303–04 (conferring absolute immunity on defendants, upon finding that challenged testimony was given before an entity "ha[ving] the power of subpoena," without inquiring whether defendants themselves testified pursuant to a subpoena). Since a committee such as the Senate Subcommittee unquestionably has the power to subpoena witnesses to testify before it, *see* 2 U.S.C. § 190b(a), Ortho's entitlement to absolute immunity is not affected by the fact that Braun did not testify before the Senate Subcommittee pursuant to a subpoena.

■ In sum, the Court holds, as a matter of New York law, that any witness who appears before a legislative committee is immune from a subsequent lawsuit based on the testimony that the witness gave to the committee, unless (1) the witness's challenged testimony did not relate to the subject matter of the committee's inquiry, or (2) the committee did not have the power to subpoena the witness to testify before it. Here, then, since all six of plaintiff's causes of action are based on Braun's testimony before the Senate Subcommittee, since Braun's testimony concededly related to the subject matter of the Senate Subcommittee's inquiry, and since the Senate Subcommittee unquestionably had the power to subpoena Braun to testify before it, Ortho is absolutely immune from suit with respect to each of plaintiff's six causes of action.

### IV

Ortho is, under New York law, absolutely immune from suit with respect to each of plaintiff's six causes of action. Accordingly, Ortho's motion for summary judgment is granted. The complaint is dismissed in its entirety.

It is so ordered.

---

7. The comments to section 588 of the *Restatement,* entitled "Witnesses in Judicial Proceedings," are fully applicable to section 590A of the *Restatement,* entitled "Witnesses in Legislative Proceedings." *See Restatement (Second) of the Law of Torts* § 590A, comment a (1976).