Raymonde **ABRAMS, et al., Plaintiffs,**

v.

**SOCIÉTÉ NATIONALE DES CHE-MINS DE FER FRANÇAIS,**
Defendant.

**No. CIV.A.00–CV–5326(DGT).**

United States District Court,
E.D. New York.

Nov. 5, 2001.

---

Stephen T. Rodd, Abbey, Gardy & Squitieri, L.L.P., Harriet Tamen, Clifford James, Blair C. Fensterstock, Fensterstock & Partners, LLP, Richard H. Weisberg, Cardozo Law School, Lucille A. Roussin, New York City, for plaintiffs.

Mitchell A. Karlan, Gibson Dunn & Crutcher, New York City, for defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiffs, Holocaust survivors filing suit on behalf of themselves and on behalf of other Holocaust victims similarly situated, bring this action against the French national railroad company, the Société Nationale Des Chemins De Fer Français ("SNCF"), claiming violations of customary international law and the law of nations arising out of alleged deportation of Jews and others from their homes in France to various Nazi death camps during World War II. Defendants now move to dismiss this action because of a lack of subject matter jurisdiction due to SNCF's entitlement to sovereign immunity. Plaintiffs have cross-moved for discovery on issues relevant to the sovereign immunity determination in the event that the court finds there to be factual issues that need to be resolved prior to ruling on SNCF's motion.

### Background

Created in August 1937 by the unification of the five major regional rail networks of France and reorganized as a corporation by a decree issued on December 11, 1940, *see* Decl. of Corinne Hershkovitch ¶¶ 2–3, with its principal place of business in Paris, France, SNCF is currently an "établissement public industriel et commercial" formed by law no. 82–1153, promulgated by the French government on February 18, 1983. *See* Decl. of Stephan Haimo Supp. Mot. Dis. [hereinafter "Haimo Decl."] ¶ 2; Decl. of Frank Terrier Supp. Mot. Dis. [hereinafter "Terrier Decl."] ¶ 2. An "établissement public" is an instrumentality of the state which has separate legal existence and is charged with performing a public service. *See* Haimo Decl. ¶ 2. It has no shares and no shareholders, is wholly owned by the state of France, and is not run for profit. *See id.* ¶ 3; Terrier Decl. ¶¶ 4, 9. Rather, its President and members of the governing board are appointed by the French government. *See* Haimo Decl. ¶ 3. Other members of the governing board are consumers and employees of SNCF. *See id.*

The public service that SNCF performs is operating a monopoly over rail transport in France. *See* Haimo Decl. ¶ 3. It owns and operates France's national railway system, with its passenger and freight trains running chiefly in France and other European countries. *See* Terrier Decl. ¶ 3. Pursuant to French law, the state supervises SNCF's administration of its services and financial matters and exercis-

es ultimate control over its operations. *See id.* ¶ 6.

### Discussion

#### (1)

The positions of the parties can be summarized fairly succinctly. SNCF argues that this court lacks subject matter jurisdiction over plaintiffs' claims under the Foreign Sovereign Immunities Act ("FSIA"). Alternately, if the FSIA does not apply, SNCF would have been immune from suit under sovereign immunity law as it existed prior to the effective date of the FSIA. Plaintiffs counter that the FSIA does not apply to conduct occurring prior to 1952 and that under pre–1952 law, SNCF would not have been immune from suit.

To establish a bit of necessary background, a brief history of the purposes behind the enactment of the FSIA is in order. Before 1952, foreign sovereigns were entitled to assert absolute immunity from suit in United States courts. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983). "But in the so-called Tate Letter, the State Department announced its adoption of the 'restrictive' theory of foreign sovereign immunity. Under this theory, immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Id.* at 487, 103 S.Ct. at 1968.

> The restrictive theory was not initially enacted into law, however, and its application proved troublesome. As in the past, initial responsibility for deciding questions of sovereign immunity fell primarily upon the Executive acting through the State Department, and the courts abided by "suggestions of immunity" from the State Department. As a consequence, foreign nations often placed diplomatic pressure on the State Department in seeking immunity. On occasion, political considerations led to suggestions of immunity in cases where immunity would not have been available under the restrictive theory.

*Id.*

> "In 1976, Congress passed the Foreign Sovereign Immunities Act in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that ... decisions are made on purely legal grounds and under procedures that insure due process.'" *Id.* at 488, 103 S.Ct. at 1968 (citation omitted).

> For the most part, the Act codifies, as a matter of federal law, the restrictive theory of sovereign immunity. A foreign state is normally immune from the jurisdiction of federal and state courts, 28 U.S.C. § 1604, subject to a set of exceptions specified in §§ 1605 and 1607. Those exceptions include actions in which the foreign state has explicitly or impliedly waived its immunity, § 1605(a)(1), and actions based upon commercial activities of the foreign sovereign carried on in the United States or causing a direct effect in the United States, § 1605(a)(2). When one of these or the other specified exceptions applies, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606.

*Id.* at 488–489, 103 S.Ct. at 1968–69.

Wright, Miller and Cooper, in their multi-volume "Federal Practice and Procedure" treatise, expand upon these themes:

> The Foreign Sovereign Immunities Act (FSIA) of 1976 was designed to provide a set of comprehensive regulations governing access to the federal and state courts in this country for plaintiffs

asserting claims against foreign states and instrumentalities thereof. The enactment of this legislation responded to the reality that increased contacts between American citizens and companies on the one hand, and foreign states and entities owned by foreign states on the other, as well as a constantly expanding range of governmental activities, had created the need for judicial fora in this country to resolve disputes arising out of these activities. In addition, the Act addressed the uncertainties of the then current American judicial practices and Department of State policies with regard to a foreign nation's sovereign immunity.

According to the House Report, the statute was designed to accomplish four objectives. First, the Immunities Act codified the so-called "restrictive" principle of sovereign immunity, as recognized in international law. Under this doctrine, the immunity of a foreign state in the courts of the United States is "restricted" to claims involving the foreign state's public acts and does not extend to suits based on its commercial or private conduct. This principle was adopted by the Department of State in 1952 and has been followed by American courts in numerous cases and by the executive branch of the national government ever since. Moreover, the principle is regularly applied in suits against the United States in foreign courts.

Second, the 1976 statute tried to insure that this restrictive principle of sovereign immunity is applied uniformly in litigation before United States courts. Prior to the Act, when a foreign state wished to assert immunity, it often requested the Department of State to make a formal suggestion of immunity to the court. Although the State Department espoused the restrictive principle of immunity, the foreign state might

have attempted to bring diplomatic influences to bear upon the Department's sovereign-immunity determination. A principal purpose of the Immunities Act was to transfer the immunity determination from the executive branch to the judicial branch of the national government, thereby reducing the issue's foreign policy implications and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process and uniformity of application. In this regard, the statute brought American immunity practice into conformity with the practice of almost every other country in the world.

Third, the Foreign Sovereign Immunities Act provides a formal procedure for making service of process upon, giving notice to, and obtaining in personam jurisdiction over a foreign state or one of its instrumentalities in an action in a United States court. The existence of this procedure renders unnecessary the former practice of seizing and attaching the property of a foreign government for the purpose of obtaining personal jurisdiction over it in the United States.

Fourth, the statute purports to remedy, at least in part, the predicament of a plaintiff who has obtained a judgment against a foreign state. Under prior law, a foreign state enjoyed absolute immunity from execution, even in ordinary commercial litigation in which commercial assets were available in this country for satisfying this broad immunity. It conformed the execution-immunity rules more closely to the jurisdiction-immunity rules and provides the judgment creditor some remedy if, after a reasonable period, a foreign state or its enterprise fails to satisfy a judgment rendered against it.

Wright, Miller & Cooper, 14A Federal Practice and Procedure: Jurisdiction 3d § 3662 (footnotes omitted).

The FSIA itself consists of both jurisdictional and sovereign-immunity provisions, which work in tandem. For the purposes of this case, the relevant jurisdictional language appears in 28 U.S.C. § 1330(a), which provides that:

The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a) (1976).

It is then necessary to ask what constitutes a foreign state under the sovereign immunity provisions. Section 1603(a) and § 1603(b) specifically address the issue:

(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. §§ 1603(a), (b) (1976).

Section § 1604, entitled "Immunity of a foreign state from jurisdiction," in turn, provides that:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604 (1976). § 1605 then proceeds to itemize various exceptions to sovereign immunity of foreign states. There will be occasion to focus on these exceptions shortly.

### (2)

The first question that must be addressed is whether the FSIA permits this court to exercise subject matter jurisdiction over plaintiffs' claims against SNCF. SNCF argues that plaintiffs have conceded that the FSIA does not permit jurisdiction over their claims:

The parties agree that 28 U.S.C. § 1330 does not provide subject matter jurisdiction over this action. Although section 1330 grants subject matter jurisdiction to federal district courts over certain actions against "foreign states," plaintiffs' Complaint and opposition brief make plain that the plaintiffs are not here alleging the existence of subject matter jurisdiction under section 1330. Plaintiffs concede this point because they must; this action does not fall within any of the exceptions to immunity specified in 28 U.S.C. §§ 1605–07, and section 1330 therefore does not confer subject matter jurisdiction over this action.

Def.'s Repl. at 4. Plaintiffs, however, insist that they have not conceded anything of the sort: "Plaintiffs do not 'concede' subject matter jurisdiction under § 1330 as SNCF alleges. Plaintiffs' position is that § 1330 does not apply because the FSIA, of which it is a part, is not retroactive." Pls.' SurRepl. at 2, n. 6. Since plaintiffs have insisted that their failure to address the issue of whether or not this court has subject matter jurisdiction under the enumerated exceptions to the sovereign immunity provisions of the FSIA does not represent a concession, it will not be treated as such.[1]

■ As a threshold matter, SNCF, wholly owned by the French government as it is, fits foursquare into the definition of an "agency or instrumentality of a foreign state" as defined in § 1603(b). SNCF is a "separate legal person, corporate or otherwise," 28 U.S.C. § 1603(b)(1), "which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," 28 U.S.C. § 1603(b)(2), and "which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country." 28 U.S.C. § 1603(b)(3). Plaintiffs do not contest this conclusion, and it is supported by relevant caselaw. *See NYSA–ILA Pension Trust Fund v. Garuda Indonesia,* 7 F.3d 35, 38 (2d Cir.1993) (corporation owned by foreign state); *Moses v. Air Afrique,* No. 99–CV–541, 2000 WL 306853, at *2 (E.D.N.Y. March 21, 2000) (airline owned by West African nations); *Seramur v. Saudi Arabian Airlines,* 934 F.Supp. 48, 51 (E.D.N.Y.1996) (airline corporation wholly-owned by Saudi Arabia).

"Once the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir.1993); *Cabiri v. Government of the Republic of Ghana,* 165 F.3d 193, 196 (2d Cir.1999). Here, plaintiffs have clearly not shouldered this burden, since they have not taken the position that the FSIA is applicable to this case.

Nevertheless, it is worth pausing to confirm that none of the exceptions to the FSIA can be invoked here. Only four of the enumerated exceptions are possibly relevant, so only those four will be addressed here.

■ First, there is the exception for commercial activities, which allows a plaintiff to maintain a suit where

the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). In this case, there is clearly no commercial activity by a foreign state carried on in the United States, and there is no act performed in the United States in connection with a commercial activity by a foreign state. The only question is whether there is an act outside the

---

1. It should be noted that even in their complaint, plaintiffs did not plead § 1330 as a basis for subject matter jurisdiction.

territory of the United States in connection with a commercial activity of a foreign state that causes a direct effect in the United States.

Despite the horrendous consequences to the plaintiffs, some of whom were American citizens, of SNCF's alleged conduct, the law to date would not consider such effects as within the parameters of the commercial activity exception. "Indirect injurious consequences within this country of an out-of-state act are not sufficient contacts to satisfy the 'direct effect' requirement of section 1605(a)(2)." *Harris v. VAO Intourist, Moscow*, 481 F.Supp. 1056, 1062 (E.D.N.Y.1979) ("Obviously the negligent operation of a hotel in Moscow causing the death of a United States resident has effects in the United States; here it leaves aggrieved relatives in this country. But the precise issue is not whether the fire had any effect here, but whether it had a 'direct effect' in the United States within the meaning of the statutory language"); *see also Princz v. Fed'l Republic of Germany*, 26 F.3d 1166, 1172–73 (D.C.Cir.1994) ("Mr. Princz argues that his continued suffering in the United States is a direct effect of his forced labor under the Nazi yoke. After Mr. Princz was liberated by the United States Army he spent time recuperating in a military hospital. From there he went to Czechoslovakia to search for relatives and to attend to his family's property, only after which did he move to the United States. Mr. Princz's subsequent suffering was clearly an effect, but just as clearly not 'a direct effect in the United States' of the Nazis' actions.... The lingering effects of a personal injury suffered overseas can not be sufficient to satisfy the direct effect requirement of the FSIA. Otherwise, 'the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states.'"); *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir.1993) ("the fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception"); *Casalino v. Ente Ferrovie dello Stato*, 779 F.Supp. 338, 341 (S.D.N.Y.1991) ("This action is not based upon any commercial activity carried on by Ente Ferrovie in the United States. Mrs. Casalino purchased her rail ticket in Milan for transportation on a train operated by defendant Ente Ferrovie within the borders of Italy. Her alleged injuries were sustained while a passenger on that domestic journey in Italy. The fact that plaintiff could have purchased her ticket from an alleged agent of defendant in New York does not establish any particular tie between Ente Ferrovie's activities in the United States and the alleged injuries sustained by plaintiff in Italy"); *Lasagne v. Divi Hotels*, 685 F.Supp. 88, 90 (S.D.N.Y.1988) ("suffering pain in the United States as a result of injury elsewhere is not a sufficiently 'direct effect' within the meaning of § 1605(a)(2)"). Accordingly, even if SNCF's activities implicated in this case can be considered commercial in nature, which SNCF contends they cannot be, *see* Def.'s Mem. at 7, n. 4., there is certainly no direct effect on commerce in the United States. The commercial activity exception, therefore, does not apply.

■ Next, there is an exception for noncommercial torts supplied in 28 U.S.C. § 1605(a)(5). This exception applies to claims

> not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state

while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5). This section is inapplicable to the case at bar, since there is a requirement that the tort occur in the United States. Courts have interpreted this section to mean that the tort must have taken place entirely within the United States. *See, e.g., Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441, 109 S.Ct. 683, 692, 102 L.Ed.2d 818 (1989); *Fickling v. Commonwealth of Australia*, 775 F.Supp. 66, 72. In this case, no part of the tort is alleged to have occurred in the United States.

█ The third exception that could possibly have any relevance, albeit marginal, to this case is the waiver of immunity exception embodied in 28 U.S.C. § 1605(a)(1), which removes immunity in cases

> in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver.

28 U.S.C. § 1605(a)(1). Plaintiffs adduce several cases from before 1952 where SNCF did not appear to raise a sovereign immunity defense to show that SNCF did not consider itself immune from suit under pre-FSIA law. *See* Pls.' Mem. at 30; Pls.' Repl. at 8. Although plaintiffs do not appear to be arguing that these cases somehow imply that SNCF has currently waived its immunity defense, it should be noted that such an argument, if made, would fail:

> An examination of the legislative history of the FSIA reveals three examples of implied waiver: (1) when a foreign sovereign agrees to arbitrate in another country; (2) when a foreign sovereign agrees that the law of another country governs a particular contract; and (3)

when a foreign sovereign fails to raise the defense of sovereign immunity in its responsive pleadings. H.R.Rep. No. 1487, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad. News 6604, 6617.

*Fickling,* 775 F.Supp. at 70; *see also Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1017 (2d Cir.1991). The facts of this case implicate none of these three categories.

However, in *Princz v. Fed'l Republic of Germany,* 26 F.3d 1166 (D.C.Cir.1994), a case that will be discussed at length below, Judge Wald, in dissent, suggested that the waiver exception should be applied to claims against Germany by a Holocaust survivor under the theory that all nations are understood to have consented to suits for violations of so-called *jus cogens* norms. *See id.* at 1179 (Wald, J., dissenting). A *jus cogens* norm is "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law of the same character." *Id.* at 1179–80. After setting about the task of demonstrating that the conduct of the Nazis during the Second World War did indeed violate accepted *jus cogens* norms, Judge Wald concluded that

> [i]n the absence of any indication that Congress intended to exclude from the scope of § 1605(a)(1) the concept that a foreign state waives its immunity by breaching a peremptory norm of international law, I believe that the only way to interpret the FSIA in accordance with international law is to construe the Act to encompass an implied waiver exception for *jus cogens* violations. Congress did not intend to thwart the opportunity of an American victim of the

Holocaust to have his claims heard by the United States judicial system.

*Id.* at 1184–85.

Appealing as Judge Wald's view may be, it was rejected by the *Princz* majority. The majority, then-Judge Ginsburg writing for the court, found that the *"jus cogens* theory of implied waiver is incompatible with the intentionality requirement implicit in § 1605(a)(1). [Citing numerous cases in support of this proposition.] That requirement is also reflected in the examples of implied waiver set forth in the legislative history of § 1605(a)(1), all of which arise either from the foreign state's agreement (to arbitration or to a particular choice of law) or from its filing a responsible pleading without raising the defense of sovereign immunity." *Id.* at 1174. "[S]ince the FSIA became law, courts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity," then-Judge Ginsburg continued. *Id.*

> In sum, an implied waiver depends upon the foreign government's having at some point indicated its amenability to suit. Mr. Princz does not maintain, however, that either the present government of Germany or the predecessor government of the Third Reich actually indicated, even implicitly, a willingness to waive immunity for actions arising out of Nazi atrocities. We have no warrant, therefore, for holding that violation of *jus cogens* norms by the Third Reich constitutes an implied waiver of sovereign immunity under the FSIA.

*Id.*

Judge Ginsburg went on specifically to reject Judge Wald's arguments:

> Judge Wald finds that grant [of jurisdiction] through a creative, not to say strained, reading of the FSIA against the background of international law it-

self. We think that something more nearly express is wanted before we impute to the Congress an intention that the federal courts assume jurisdiction over the countless human rights cases that might well be brought by the victims of all the ruthless military juntas, presidents-for-life, and murderous dictators of the world, from Idi Amin to Mao Zedong. Such an expansive reading of § 1605(a)(1) would likely place an enormous strain not only upon our courts but, more to the immediate point, upon our country's diplomatic relations with any number of foreign nations. In many if not most cases the outlaw regime would no longer even be in power and our Government could have normal relations with the government of the day—unless disrupted by our courts, that is. Like Judge Wald, we recognize that this suit may represent Mr. Princz's last hope of reparation. Still, we cannot responsibly make the inferential leap that would be required in order to provide him with the federal forum he seeks.

*Id.* at n. 1.

More recently, the Seventh Circuit in *Sampson v. Fed'l Republic of Germany*, 250 F.3d 1145 (7th Cir.2001), a case that will also be discussed at length below, rejected the same *jus cogens* argument in a situation with similar facts, involving a suit for slave labor exacted by the Nazis during World War II. The Circuit referred to the *jus cogens* argument as encouraging "an evolving understanding of waiver, an understanding which is necessarily subject to the vagaries of customary international law. Customary international law can evolve unpredictably without reference to the understandings of courts or Congress." *Id.* at 1154. Incorporating *jus cogens* norms into the waiver exception, the court held, "would entail a truly novel and possi-

bly unrestrained form of jurisdiction.... Congress could not have intended to confer a jurisdiction so malleable on Article III courts without a clear statement to that effect." *Id.* at 1154–55.

Although there is clear authority[2] as well as policy considerations—including its possible abuse by foreign courts against officials of America and its allies-that militate against the adoption of Judge Wald's *jus cogens* waiver theory, there is no need to decide the issue here definitively. Plaintiffs have not sought jurisdiction pursuant to the waiver exception and have not argued that such jurisdiction exists.

■ Finally, in § 1605(a)(7), the FSIA provides an exception for actions seeking:

money damages ... against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency, except that the court shall decline to hear a claim under this paragraph—

(A) if the foreign state was not designated as a state sponsor of terrorism under 6(j) of the Export Administration Act of 1979 (50 U.S.C.App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371) at the time the act occurred, unless later so designated as a result of such act....

28 U.S.C. § 1605(a)(7). The text of the exception makes clear why it does not apply. Even if the acts here in question could be classified as provision of material

support for an act of extrajudicial killing by an official, employee or agent of a foreign state acting within the scope of his or her office, employment or agency, there would still remain the fact that the nation of France has not been designated as a state sponsor of terrorism under either the Export Administration Act of 1979 or under the Foreign Assistance Act of 1961.

Thus, it would appear that none of the exceptions to the FSIA apply to this case. SNCF is a foreign state entitled to immunity under the FSIA, and this court has no jurisdiction over plaintiffs' claims under § 1330 if that provision indeed governs the case at bar.

(3)

■ The principal question in this case, then, is whether the FSIA applies to the conduct alleged to have taken place during World War II, prior to 1976, the year the FSIA was enacted and prior to 1952, the year of the Tate Letter which adopted the restrictive theory of sovereign immunity. Plaintiffs argue that the FSIA does not apply to this action. In fact, as noted above, their complaint does not even seek to make out a basis for jurisdiction under the FSIA. Rather, they seek to invoke the jurisdiction of this court pursuant to 28 U.S.C. § 1331 "because all Plaintiffs' claims involve substantial international law and federal questions, and because all Plaintiffs' claims arise under customary international law enforceable in this Court as federal common law," Pls.' Compl. ¶ 37, and the Alien Tort Claims Act, 28 U.S.C. § 1350. *See* Pls.' Compl. ¶ 38.

Plaintiffs' argument against the applicability of the FSIA is premised almost entirely on a 1988 Second Circuit case, *Carl Marks & Co. v. Union of Soviet Socialist*

---

**2.** The Ninth Circuit has also held that *jus cogens* norms could not be used to secure jurisdiction over a sovereign nation. *See Sid-* *erman de Blake v. Republic of Argentina,* 965 F.2d 699 (9th Cir.1992).

*Republics,* 841 F.2d 26 (2d Cir.1988), where plaintiffs, class representatives of holders of debt instruments issued by the Russian Imperial Government in 1916, brought suit against the Soviet Union to recover on those instruments. The Second Circuit held that the FSIA was not retroactive to before 1952:

> We agree with the district court that although the issuance of public debt falls within the "commercial activity" exception of § 1605(a)(2) of the FSIA, *see* 665 F.Supp. at 335–36, the federal courts have no jurisdiction over these suits. The district court found that the Act is inapplicable to claims arising before the State Department issued the "Tate Letter" in 1952, adopting the "restrictive theory" of sovereign immunity that excluded nonpublic and commercial activities, *see id.* at 335. Such a retroactive application of the FSIA would affect adversely the USSR's settled expectation, rising "to the level of an antecedent right," of immunity from suit in American courts. *Id.* at 338–39. We believe, as did the district court, that "[o]nly after 1952 was it reasonable for a foreign sovereign to anticipate being sued in the United States courts on commercial transactions," 665 F.Supp. at 339. However, we need not decide the effect of the FSIA on causes of action arising between 1952 and the enactment of the Act.

*Id.* at 27 (some citations omitted). The Eleventh Circuit had reached the same conclusion in 1986. *See Jackson v. People's Republic of China,* 794 F.2d 1490, 1498–99 (11th Cir.1986) ("We agree that to give the Act retrospective application to pre 1952 events would interfere with antecedent rights of other sovereigns (and also with antecedent principles of law that the United States followed until 1952). It would be manifestly unfair for the United States to modify the immunity afforded a foreign state in 1911 by the enactment of a statute nearly three quarters of a century later").

But there is reason to believe that *Carl Marks* does not govern the case at bar. To begin with, *Carl Marks* may no longer be good law, or may at least be limited in its application, in the wake of the Supreme Court's decision in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Although *Landgraf*'s subject matter had nothing at all to do with the FSIA, involving, as it did, the retroactivity of provisions of the Civil Rights Act of 1991, the *Landgraf* court had some very relevant things to say about retroactivity:

> We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the suit was filed. Thus, in *Bruner v. United States,* 343 U.S. 112, 116–117, 72 S.Ct. 581, 584–585, 96 L.Ed. 786 (1952), relying on our "consisten[t]" practice, we ordered an action dismissed because the jurisdictional statute under which it had been (properly) filed was subsequently repealed. Conversely, in *Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604, 607–608, n. 6, 98 S.Ct. 2002, 2005, n. 6, 56 L.Ed.2d 570 (1978), we held that, because a statute passed while the case was pending on appeal had eliminated the amount-in-controversy requirement for federal-question cases, the fact that respondent had failed to allege $10,000 in controversy at the commencement of the action was "now of no moment." Application of a new jurisdictional rule usually "takes away no substantive right but simply changes that tribunal that is to hear the case." Present law normally governs in such situations because jurisdictional statutes "speak to the power of the court

rather than to the rights or obligations of the parties."

*Id.* at 274, 114 S.Ct. at 1501–02 (some citations omitted).

Justice Scalia, in his concurrence, joined by Justices Kennedy and Thomas, expanded upon the majority's discussion of jurisdictional statutes in a manner particularly relevant to the case at bar:

> The Court explains this aspect of our retroactivity jurisprudence by noting that "a new jurisdictional rule" will often not involve retroactivity in Justice Story's sense because it " 'takes away no substantive right but simply changes the tribunal that is to hear the case.' " That may be true sometimes, but surely not always. A jurisdictional rule can deny a litigant a forum for his claim entirely, *see* Portal–to–Portal Act of 1947, 61 Stat. 84, as amended, 29 U.S.C. §§ 251–262, or may leave him with an alternate forum that will deny relief for some collateral reason (e.g., a statute of limitations bar). Our jurisdictional cases are explained, I think, by the fact that the purpose of provisions conferring or eliminating jurisdiction is to permit or forbid the exercise of judicial power-so that the relevant event for retroactivity purposes is the moment at which that power is sought to be exercised.

*Id.* at 292–293, 114 S.Ct. at 1526 (Scalia, J., concurring) (some citations omitted).

Both the majority and Justice Scalia's concurrence suggest, then, that as soon as jurisdictional statutes are enacted, they are applied to any case that is filed, regardless of whether the actual events alleged to have taken place pre-date the passage of the relevant jurisdictional statute. At times, of course, as Justice Scalia points out, the application of these jurisdictional statutes will unsuit a party who would have expected to have had access to the courts under the jurisdictional regime

in force during the time when the litigable events occurred, or, more frequently, will relegate the dispute among the parties to a forum that is, in one way or another, undesirable or prejudicial to the rights of one or more of the litigants. This is inevitable due to the lack of a clear boundary between substance and procedure.

Indeed, courts addressing the FSIA's retroactivity in a post-*Landgraf* environment have relied upon *Landgraf* to indicate or arrive at results contrary to that reached by the Second Circuit in *Carl Marks*. In *Haven v. Rzeczpospolita Polska (Republic of Poland)*, 68 F.Supp.2d 943 (N.D.Ill.1999), for example, owners of property in Poland brought suit against the Polish government for wrongful seizure and expropriation of real property during and shortly after the Second World War. The court began with the standard dichotomy, that "[b]efore 1952 foreign sovereigns were entitled to assert absolute immunity from suit in United States courts," *id.* at 944, while after 1952, the Tate Letter "restricted that immunity to suits involving the public acts of a foreign sovereign, while eliminating such immunity for commercial acts." *id.* The change in the law was outcome-determinative in the case, in the sense that applying post 1952 sovereign immunity law would have permitted jurisdiction over these claims. The district court wrote:

> Three Courts of Appeals have weighed in on [whether Congress conferred jurisdiction over claims arising before 1952 in enacting the FSIA]: first, *Jackson,* then *Carl Marks & Co., Inc. v. USSR,* 841 F.2d 26, 27 (2d Cir.1988) (per curiam) and, less than two months ago, *Creighton Ltd. v. Government of the State of Qatar,* 181 F.3d 118 (D.C.Cir. 1999). That has produced a 2 to 1 split in favor of a negative answer to the question, although only the most recent

(and minority) decision has had the benefit of the Supreme Court's definite teaching on the subject of retroactivity in *Landgraf.*

*Id.* at 945 (some citations omitted). The court then proceeded to distinguish *Carl Marks* and *Jackson,* arguing that the basis for those two decisions was not a jurisdictional one in the *Landgraf* sense, "that is, whether the Act applies to conduct that predated its grant of subject matter jurisdiction," *id.* at 946, but rather "how far back the conduct susceptible to relief should go once such jurisdiction has been conferred." *Id.* The court then concluded that although the question was close, "this Court finds the District of Columbia view—articulated as it has been in two post-*Langraf* decisions (*Princz,* 26 F.3d at 1170–71 and *Creighton* ), and having commanded the adherence of five judges of that court-to be more persuasive." *Id.*

Even more recently, in *Altmann v. Republic of Austria,* 142 F.Supp.2d 1187 (C.D.Cal.2001), the Central District of California, addressing a lawsuit against the Republic of Austria seeking return of Klimt paintings allegedly stolen by the Nazis in the early 1940s in Austria and currently in the possession of the Austrian Gallery, reached the same conclusion, viz., that there was jurisdiction over pre–1952 claims under the FSIA. Again, plaintiffs sought to apply the FSIA retroactively, while the defendants claimed that pre–1952 law was controlling. "Although the Defendants' position on the FSIA's applicability to pre 1952 events is supported by case law," the district court wrote, "the continued viability of these cases is in doubt in light of the United States Supreme Court's subsequent decision in *Landgraf. Landgraf,* as well as cases decided after *Landgraf* regarding the FSIA's application to pre–1952 events, lead the Court to conclude that the FSIA applies to pre–1952 events." *Id.* at 1199. The court

continued: "[T]he Supreme Court rejected the rationale that was employed by the *Jackson, Carl Marks,* and *Slade* courts in situations involving the question of retroactivity of jurisdictional statutes. In these situations, the Supreme Court favors applying the law in effect at the time of the decision." *Id.* at 1200. Noting that "[t]he FSIA does not affect any substantive law determining the liability of a foreign state or instrumentality," *id.* (citing *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 620, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983); H.R.Rep. No. 94–1487 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin. News at 6610 ("The bill is not intended to affect the substantive law of liability.")), the court concluded that the FSIA's provisions must be applied to events pre-dating 1952.

Most expansive on the issue, however, was the D.C. Circuit's decision in *Princz v. Federal Republic of Germany,* 26 F.3d 1166 (1994), decided only a few months after the Supreme Court's holding in *Landgraf.* In *Princz,* a Holocaust survivor who was an American citizen at the time of the lawsuit but not at the time when the underlying conduct occurred sued the Federal Republic of Germany for injuries suffered and slave labor performed while a prisoner in Nazi death camps. Plaintiff sought to steer the court towards the FSIA and its commercial activity and waiver exceptions and away from the law before 1952, when "the United States, as a matter of grace and comity, granted foreign sovereigns 'virtually absolute immunity' from suit in the courts of this country." *Id.* at 1169 (citation omitted). The D.C. Circuit wrote:

There is a strong argument in favor of applying the FSIA retroactively, however. In declaring the purpose of the FSIA, the Congress directed that "[c]laims of foreign states to immunity

should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter." 28 U.S.C. § 1602. This suggests that the FSIA is to be applied to all cases decided after its enactment, i.e. regardless of when the plaintiff's cause of action may have accrued. *But see Jackson,* 596 F.Supp. at 388. Moreover, when it enacted the FSIA, the Congress deleted from 28 U.S.C. § 1332 the provision for diversity jurisdiction over suits brought by a United States citizen against a foreign government. According to the House Report on the FSIA, "since jurisdiction in actions against foreign states is comprehensively treated by the new section 1330, a similar jurisdictional basis under section 1332 becomes superfluous." H.R.Rep. No. 9401487, 94th Cong.2d Sess., 14 (1976). Unless one is to infer that the Congress intentionally but silently denied a federal forum for all suits against a foreign sovereign arising under federal law that were filed after enactment of the FSIA but based upon pre-FSIA facts, the implication is strong that all questions of foreign sovereign immunity, including those that involve an act of a foreign government taken before 1976, are to be decided under the FSIA. *See Yessenin–Volpin,* 443 F.Supp. 849, 851 n. 1.

Indeed, under the teaching of a recent Supreme Court case, application of the FSIA to the pre 1952 events here in suit may not even count as "a genuinely 'retroactive' effect" [citing *Landgraf*]. . . . [I]t might be argued, application of the FSIA (and particularly application of an exception set out in the FSIA) to the

events at issue in this case would not alter Germany's liability under the applicable substantive law in force at the time, i.e. it would just remove the bar of sovereign immunity to the plaintiff's vindicating his rights under that law. *Id.* at 1169–70.

Ultimately, however, although swayed in the direction of applying the FSIA to pre–1952 events, the D.C. Circuit did not feel it necessary to rule definitively on the issue for reasons that will be considered in full a bit later.[3] The point, for the purposes of the present discussion, is that in the wake of *Landgraf,* courts considering the retroactivity of the FSIA to pre 1952 conduct have begun to diverge from the course charted by the Second Circuit in *Carl Marks.* Plaintiffs, however, attempt to avoid the implications of *Landgraf* by arguing that the FSIA, in contrast to other jurisdictional statutes, works a substantive change in immunity law, and is, thus, different from the purely jurisdictional statutes which the Court had in mind when it concluded that newly-enacted jurisdictional statutes should be applied to all cases filed after their enactment, regardless of the date of the underlying conduct alleged. *See* Pls.' Mem. Law Opp. Def.'s Mot. Dis. and Supp. Cross Mot. [hereinafter "Pls.' Mem."] at 7–8.

In support of their contention, plaintiffs cite *Hughes Aircraft Co. v. U.S.,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997), where the Court had occasion to consider the retroactivity of the *qui tam* provision of the False Claims Act, 31 U.S.C. §§ 3730(b) which permits, in certain circumstances, suits by private parties on behalf of the United States against

---

**3.** It should be noted that Judge Wald's dissenting opinion in *Princz,* although disagreeing with the majority's result and finding jurisdiction over Mr. Princz's claims under the implied waiver exception to the FSIA, was

unequivocal about the fact that the FSIA was the *sole* means of obtaining jurisdiction over Princz's World War II-era claims. *See id.* at 1178 (Wald, J. dissenting).

anyone submitting a false claim to the Government. Prior to 1986, as the Court explained, such suits were barred if the information on which they were based was already in the Government's possession. However, a 1986 amendment to the False Claims Act partially removed that bar. The plaintiff in *Hughes* had brought suit under the False Claims Act based on conduct pre-dating the effective date of the amendment and argued that the amendment, which he needed to maintain his suit, should apply to his claim. In support of this point, he argued that the 1986 amendment is merely jurisdictional and, therefore, an exception to the general *Landgraf* presumption against retroactivity. *Id.* at 950, 117 S.Ct. at 1878. The Court responded:

> Statutes merely addressing *which* court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties. Such statutes affect only *where* a suit may be brought, not *whether* it may be brought at all. The 1986 amendment, however, does not merely allocate jurisdiction among forums. Rather, it *creates* jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in "jurisdictional" terms, is as much subject to our presumption against retroactivity as any other.

*Id.* at 950–951, 117 S.Ct. at 1878 (emphasis in original).

Thus, the argument would go, the FSIA does not merely affect where a suit may be brought but rather, contracts the scope of sovereign immunity, thereby *creating* jurisdiction where none previously existed over commercial activities of foreign nations. Accordingly, the FSIA should not be applied to pre–1952 events.

Several considerations undermine plaintiffs' argument on this point. First, the *qui tam* provision of the False Claims Act might be distinguished from the FSIA on the grounds that both the House Report accompanying the bill and the Supreme Court have found that the FSIA was not intended to affect any substantive law of liability. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 620, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (noting that "[t]he FSIA does not affect any substantive law determining the liability of a foreign state or instrumentality."); H.R.Rep. No. 94–1487 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin. News at 6610 ("The bill is not intended to affect the substantive law of liability"). Although all jurisdictional statutes have substantive effects, and the FSIA is no exception, in point of fact, there is a significant and arguably outcome-determinative difference between an amendment to the False Claims Act, a substantive law, and the enactment of § 1330, a statute that is obviously jurisdictional in spirit, regardless of whether it may also have substantive consequences. Therefore, even if its immunity provisions allow certain suits against foreign governments in American courts where formerly none could be brought, the FSIA cannot be fundamentally viewed as speaking to the substantive rights of the parties but simply to the power of federal courts to hear such suits.

Second, and alternatively, one must remember that the FSIA consists of a subject matter jurisdiction provision, § 1330, and sovereign immunity provisions. The sovereign immunity provisions restrict the scope of sovereign immunity, thereby creating new rights, and consequently, should be retroactive only to the date when par-

ties had an expectation that immunity would be applied according to the restrictive theory, viz., 1952. However, the jurisdiction provision does not alter anything. It simply replaces § 1331 and § 1332 as the exclusive means of obtaining jurisdiction over a foreign sovereign. It is true that § 1330 makes reference to the sovereign immunity provisions in order to define the scope of federal subject matter jurisdiction, and as has been noted already, the sovereign immunity provisions, pursuant to this interpretation, should not be applied retroactively before 1952, but this is no different than saying that a party seeking to invoke the jurisdiction of a federal court pursuant to § 1331 or § 1332 could still be thrown out of court by virtue of an applicable defense, such as the statute of limitations. The fact that the statute of limitations would serve to limit the jurisdiction of a federal court over claims otherwise validly brought under § 1331 or § 1332 does not turn these jurisdictional statutes into substantive statutes. The same might be said of the relationship between § 1330 and the sovereign immunity sections of the FSIA.

Thus, in a suit premised on conduct occurring prior to 1952, the sovereign immunity law of the FSIA could not be used to create jurisdiction where none would have existed prior to that date, since this would involve retroactive application of the sovereign immunity provisions and would be directly contrary to the holding of the Second Circuit in *Carl Marks*. But conversely, § 1330 itself, a purely jurisdictional provision, would be applicable to any suit brought after the date of its enactment, even if the conduct occurred prior to 1952. Accordingly, a party filing suit today and seeking to invoke jurisdiction under § 1331 or § 1332 as he could have before the enactment of § 1330 would not be able to do so. Of course, this would mean that a plaintiff seeking federal jurisdiction over a foreign sovereign for pre 1952 events would have to use pre 1952 sovereign immunity law, which, however, could not be accessed because there would be no jurisdiction under § 1330 unless the underlying conduct also qualified under one of the exceptions to the substantive provisions of the FSIA.

To flesh out this understanding more clearly, as well as to supply some authority in support of what has been said thus far, it will be necessary to return to the aborted discussion of the D.C. Circuit's decision in *Princz*. As has already been mentioned, the *Princz* court, while suggesting that the FSIA should be retroactive to before 1952, stopped short of so holding because it was confronted with a situation where it did not have to make this decision. The court explained:

> We do not have to decide whether the FSIA applies to pre–1952 events, however, in order to resolve this case. . . . [E]ven if Germany is not immune from suit under the pre-FSIA law that would apply to Mr. Princz's claims, and even if Germany is not immune from suit under the pre-FSIA law that would apply, then as will be seen [below], a federal district court does not have jurisdiction over Mr. Princz's claims because they arise in tort and quasi contract. Mr. Princz offers no case law, and we are aware of none, suggesting that a court can revive the pre-FSIA diversity jurisdiction of § 1332 over cases brought by a United States citizen against a foreign state in order to entertain a case arising from pre-FSIA facts. In either event, therefore, the district court is without subject matter jurisdiction of the present case.

*Princz*, 26 F.3d at 1171.

The court expanded upon this conclusion later in its opinion:

What, then, if the FSIA does not apply retroactively to bar this case? In that event, Germany argues (albeit for the first time on appeal) that it is entitled to absolute sovereign immunity under the case law of this circuit as it stood during the period 1942–45, i.e. prior to the Tate Letter and the adoption of the restrictive theory of sovereign immunity. . . .

Because subject matter jurisdiction cannot be created by consent, waiver, or even estoppel, *Insurance Corp. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), we would consider this belated argument if it were of any consequence to federal jurisdiction of this case. It is immaterial, however, because there is no present basis for subject matter jurisdiction over Mr. Princz's claims in the district court regardless of the state of the circuit law concerning immunity in the period 1942–1945.

Until passage of the FSIA in 1976, 28 U.S.C. § 1332 provided for federal diversity jurisdiction over a case brought by a United States citizen against a foreign state. When the Congress passed the FSIA, however, it deleted that grant of jurisdiction from § 1332. As noted above, the House Report on the FSIA states that "[s]ince jurisdiction in actions against foreign states is comprehensively treated by the new section 1330, a similar jurisdictional basis under section 1332 becomes superfluous." H.R.Rep. No. 94–1487, 94th Cong.2d Sess., 14 (1976). New § 1330(a), in turn, asserts federal jurisdiction over a suit against a foreign state only insofar as the foreign state is not entitled to immunity under the FSIA; and as we have already held, no exception to immunity under the FSIA covers this case.

Nor is this case within the federal question jurisdiction conferred by 28 U.S.C. § 1331, because Mr. Princz's claims against Germany sound in tort and quasi contract, not in federal law. Regardless whether Germany is entitled to sovereign immunity apart from the FSIA, therefore, the district court lacks subject matter jurisdiction over Mr. Princz's claims.

*Id.* at 1175–76.

The D.C. Circuit in *Princz* appears to be making a distinction between the diversity jurisdiction provision, which was amended in 1976 to complement the FSIA, and federal question jurisdiction, which, it assumes, remained the same even after the passage of the FSIA. As Mr. Princz did not assert a claim arising under federal law, the court did not embark upon an extensive analysis of whether it would have been possible, after the effective date of the FSIA, to secure jurisdiction over a foreign sovereign under 28 U.S.C. § 1331 or whether, in fact, § 1331 implicitly became as ineffective as the explicitly-amended § 1332 in securing jurisdiction over a foreign sovereign once the FSIA was enacted.

But in the case at bar, such an analysis is necessary, for plaintiffs have attempted to invoke the subject matter jurisdiction of this court pursuant to 28 U.S.C. § 1331, as well as the Alien Tort Claims Act. The question then arises: is there a distinction between § 1332, diversity jurisdiction, and § 1331, federal question jurisdiction, when a suit is brought by a plaintiff against a foreign sovereign? Does the fact that § 1332 was actually altered by Congress in 1976 to accommodate the passing of the FSIA somehow distinguish that provision from § 1331 or the Alien Tort Claims Act?

The Supreme Court addressed precisely that question in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989),

where a Liberian corporation tried to bring claims of international law violations against the Argentine Republic under the Alien Tort Claims Act. The Court wrote:

We think that the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts. Sections 1604 and 1330(a) work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state is entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is not entitled to immunity. As we said in *Verlinden,* the FSIA "must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity."

*Id.* at 434–35, 109 S.Ct. at 688.

Even more pertinently, the Court specifically suggested that there is no distinction to be made between § 1332, which Congress explicitly amended in light of the passage of the FSIA, and other jurisdictional provisions such as § 1331 and the Alien Tort Claims Act, which Congress did not explicitly amend:

We think that Congress' failure in the FSIA to enact an express pro tanto repealer of the Alien Tort Statute speaks only faintly, if at all, to the issue involved in this case. In light of the comprehensiveness of the statutory scheme in the FSIA, we doubt that even the most meticulous draftsman would have concluded that Congress also needed to amend pro tanto the Alien Tort Statute and presumably such other grants of subject-matter jurisdiction in Title 28 as § 1331 (federal question),

§ 1333 (admiralty), § 1335 (interpleader), § 1337 (commerce and antitrust), and § 1338 (patents, copyrights, and trademarks). Congress provided in the FSIA that "[c]laims of foreign states to immunity should henceforth be decided by courts of the United States in conformity with the principles set forth in this chapter," and very likely it thought that should be sufficient. § 1602 (emphasis added); *see also* H.R.Rep., at 12; S.Rep., at 11, U.S.Code Cong. & Admin. News 1976, p. 6610 (FSIA "intended to preempt any other State and Federal law (excluding applicable international agreements) for according immunity to foreign sovereigns").

*Id.* at 437–438, 109 S.Ct. at 690. Thus, the court concluded: "We hold that the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Id.* at 443, 109 S.Ct. at 693.

Plaintiffs attempt to distinguish *Amerada Hess* by arguing that the Court in that case had no occasion to consider the retroactivity of § 1330 or other provisions of the FSIA to events occurring before its effective date, since the claims in *Amerada Hess* concerned events alleged to have occurred in 1982. *See* Pls.' Sur Repl. at 4. But the language of the *Amerada Hess* Court belies plaintiffs' assertion. The Court specifically noted Congress's command that "claims of foreign states to immunity should *henceforth* be decided by courts of the United States in conformity with the principles set forth in this chapter." *Amerada Hess,* 488 U.S. at 437, 109 S.Ct. at 690(emphasis added). And just as the D.C. Circuit found in *Princz* that "Mr. Princz offers no case law, and we are aware of none, suggesting that a court can revive the pre-FSIA diversity jurisdiction of § 1332 over cases brought by a United States citizen against a foreign state in order to entertain a case arising from pre-

FSIA facts," *Princz,* 26 F.3d at 1171, this court cannot broaden the scope of § 1331 to reflect its pre-FSIA coverage just because the events alleged to have taken place pre-dated the effective date of the FSIA. "The conclusion is inescapable from the language of the statute that Congress meant § 1330 to be the exclusive means whereby a plaintiff may sue any foreign state as defined in § 1603(a)." *Ruggiero v. Compania Peruana de Vapores Inca Capac Yupanqui,* 639 F.2d 872, 875 (2d Cir.1981). "The courts must learn to accept that, in place of the familiar dichotomy of federal question and diversity jurisdiction, the Immunities Act has created a tripartite division[:] federal question cases, diversity cases and actions against foreign states." *Id.* at 876. Congress's language, the D.C. Circuit's holding in *Princz* and especially the Supreme Court's holdings regarding the exclusivity of the FSIA as a means of obtaining jurisdiction over foreign sovereigns in *Amerada Hess* and its more general discussion of the retroactivity of jurisdictional provisions in *Landgraf,* even as clarified by the *qui tam* provision of the False Claims Act discussion in *Hughes,* preclude a return to the jurisdictional regime pre-existing the passage of the FSIA.

This precise question was squarely addressed in a Seventh Circuit case decided in February of this year. In *Sampson v. Fed'l Republic of Germany,* 250 F.3d 1145 (7th Cir.2001), that Circuit considered a suit by a pro se Holocaust survivor who had sued the government of Germany for his imprisonment in Nazi concentration camps. His claim was dismissed by the district court that heard it, in part based on sovereign immunity. On appeal, the D.C. Circuit appointed Dean Howard Eisenberg and Professor Joseph Kearney of Marquette University Law School as ami-

cus curiae to argue on Sampson's behalf. *See id.* at 1148.

The Seventh Circuit began by starting from the proposition that the FSIA governed the dispute. *See id.* at 1148. "Relevant to this appeal is the FSIA, the federal statute in which Congress defined 'the sole basis for obtaining jurisdiction over a foreign state in our courts.'" *Id.* (citing *Amerada Hess*). Thus, the Seventh Circuit determined that even in a case involving Holocaust-era claims, the FSIA was the sole means of obtaining subject matter jurisdiction. But the Seventh Circuit did not stop there; it went on to decide, specifically, that the Alien Tort Claims Act, which plaintiffs in the case at bar are trying to use as a basis for jurisdiction, cannot be a basis for jurisdiction in a case against a foreign sovereign:

It is possible to construe Sampson's brief as arguing that jurisdiction exists under the Alien Tort Claims Act, 28 U.S.C. § 1350. *See* App. Br. at 9–10 (arguing under international law that there is universal jurisdiction 'when a heinous crime is involved' and that the Alien Tort Claims Act provides a cause of action in this case). Although *Amerada Hess* involved violations of customary international law that were not *jus cogens* violations, the Supreme Court's statement that our jurisdiction is limited to exceptions under the FSIA was absolute, and was based in part on the determination that.Congress intended sovereign immunity under the statute to apply even in instances where international law was violated. The Court's holding appears to foreclose Sampson's argument.

*Id.* at n. 2.[4] *Sampson*'s analysis is equally applicable to plaintiffs' attempt to invoke

---

4. *Sampson*'s claim that the Supreme Court's    holding in *Amerada Hess* was based, in part,

the general federal question jurisdiction of this court. In short, *Sampson* addressed the precise factual situation as the case at bar presents, and the Seventh Circuit found that nothing but the FSIA can be used to secure subject matter jurisdiction over a sovereign state, even if the acts in question pre-date the passage of the FSIA.

In light of the caselaw discussed above, it may be seen that regardless of whether the Second Circuit's decision in *Carl Marks* is still good law, that decision is simply not applicable to the case at bar. With two exceptions that involve distinguishable facts, as detailed below, every single case discussed here or cited by either party, involves a situation where a plaintiff is seeking to *invoke—not avoid—* the coverage of the FSIA.[5] *Carl Marks* was no exception. The plaintiff in that case, relying on the fact that the FSIA created new rights to sue by restricting

the scope of sovereign immunity, was trying to invoke its coverage and avoid the bar to suit erected by pre 1952 sovereign immunity law. The Second Circuit, fearing that "[s]uch a retroactive application of the FSIA would affect adversely the USSR's settled expectation, rising 'to the level of an antecedent right,' of immunity from suit in American courts," found that the FSIA's sovereign immunity-altering provisions could not be applied retroactively. *Carl Marks*, 841 F.2d at 27. The same situation obtained in *Jackson. See supra.* No case that has been unearthed, with the exception of *Yessenin–Volpin*, which will be discussed shortly, has confronted the opposite situation: where a plaintiff actually seeks to avoid application of the sovereign-immunity-restricting FSIA and invoke pre-FSIA sovereign immunity law. This is because no party, at

---

on the determination that Congress intended sovereign immunity under the statute to apply even in instances where international law was violated does not cite to any specific language in the Supreme Court's opinion, but it is probably a reference to the following passage:

> Congress had violations of international law by foreign state in mind when it enacted the FSIA. For example, the FSIA specifically denies foreign states immunity in suits "in which rights in property taken in violation of international law are in issue." Congress also rested the FSIA in part on its power under Art. I, § 8, cl. 10, of the Constitution "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." From Congress' decision to deny immunity to foreign states in the class of cases just mentioned, we draw the plain implication that immunity is granted in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions.

*Amerada Hess,* 488 U.S. at 435–36, 109 S.Ct. at 689 (citations omitted).

5. The sole exceptions are *Princz,* which involved a situation where the court simply

analyzed the plaintiff's claim to conclude that the plaintiff could invoke the court's jurisdiction neither under the FSIA nor under pre-existing law, and *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation,* 605 F.2d 648 (2d. Cir.1979), cited by plaintiffs for the proposition that "retroactive application of FSIA would improperly impair antecedent rights," Pls.' Mem. at 4. *Amoco* is irrelevant to this case, as it involved an attempt by the defendants there to use § 1609 of the FSIA, which had made property of foreign states immune from attachment after the effective date of the FSIA, to attack an attachment that had been made by the plaintiffs before the effective date of the FSIA. *See id.* at 653. Thus, quite naturally, the Second Circuit in *Amoco* held that retroactive application of the FSIA in that case would impair antecedent rights. In fact, in distinguishing *Yessenin–Volpin v. Novosti Press Agency,* 443 F.Supp. 849 (S.D.N.Y.1978), a case there will be occasion to discuss later in the text, the Second Circuit specifically said that "[t]hat case did not involve retroactive application of the Act to quasi in rem attachment proceedings which had already begun," *Amoco,* 605 F.2d at 653–54, thus clearly delineating the very particular circumstances that the *Amoco* court was addressing.

least no party prior to plaintiffs in the case at bar, has argued implicitly, against the grain of Congressional intent and repeated judicial pronouncements, many of which have been noted above, that the FSIA actually *expanded* the coverage of sovereign immunity. Although plaintiffs have stopped short of making that assertion explicitly, this is, in fact, what they would have to be arguing if the FSIA does not allow jurisdiction over their claims, which it does not.[6]

Only one case, *Yessenin–Volpin v. Novosti Press Agency,* 443 F.Supp. 849 (S.D.N.Y.1978), squarely addressed a claim where a plaintiff, like those here, was actually trying to avoid the sweep of the FSIA. *See id.* at 851, n. 1 ("The plaintiff argues that the Immunities Act which 'became effective only subsequent to the time this action was commenced and long after the accrual of plaintiff's causes of action of claims,' should not be applied to this case.") The district court found that the FSIA applied retroactively and, moreover, in connection with its retroactivity discussion, made the following observation: "Indeed, insofar as the Immunities Act alters the rights of parties, it does so by *expanding* the ability of plaintiffs to obtain satisfaction of judgments against foreign states." *Id.* at 851, n. 1 (emphasis added).

Plaintiffs here naturally seek to avoid the force of *Yessenin–Volpin:*

SNCF's reliance on *Yessenin–Volpin* is misplaced. The Second Circuit in *Corporacion Venezolana*[7] merely mentioned without endorsement the court's decision in that case, which was issued a decade before *Carl Marks* and erroneously stat-

ed that the substantive provisions of the FSIA could be applied retroactively. Clearly, *Yessenin–Volpin* is no longer good law in light of *Carl Marks.*

Pls.' Sur–Repl. at 3, n. 7 (some citations omitted). But *Yessenin–Volpin* has not been explicitly overruled or even criticized during the twenty-some years of its existence, nor does anything in *Carl Marks* implicitly overrule *Yessenin–Volpin.* The two cases simply address entirely different situations: *Carl Marks,* the situation where a plaintiff seeks to invoke the FSIA for pre–1952 conduct and short-circuit a defendant's well-settled expectations of sovereign immunity for conduct occurring prior to that year, and *Yessenin–Volpin,* the situation where a plaintiff claims, somewhat mysteriously, that the FSIA, intended by Congress to expand a plaintiff's ability to sue foreign sovereigns, actually contracts his ability to do so, and seeks, consequently, to avoid the FSIA and fall back upon pre-existing sovereign immunity law. In the latter situation, which is the case at bar, the *Yessenin–Volpin* court found that there is no danger of a harmful retroactive effect, and so retroactivity of the FSIA is permissible.

There is no need to decide, however, whether or not plaintiffs here are prejudiced in an impermissibly retroactive way by the application of the FSIA to this case, since, as we have already seen, even if they were prejudiced and even if the FSIA's sovereign immunity law were, consequently, not applicable here-that is, even if older sovereign immunity law could be applied-there would still be no way to re-

---

6. As has been noted above, although plaintiffs did not concede this point, they also did not claim jurisdiction under the FSIA or in any way oppose SNCF's substantive arguments, made both in SNCF's brief in support of the motion and in SNCF's reply, that the FSIA does not permit jurisdiction.

7. The case is *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786 (2d Cir.1980).

store the jurisdictional regime of a bygone era and exercise jurisdiction over SNCF under § 1331 or the Alien Tort Claims Act.

Thus, there is no need here to fly in the face of the Second Circuit in *Carl Marks* and claim that it has been overruled by subsequent Supreme Court decisions. It is enough, rather, to make the observation that *Carl Marks* does not address the dispute in this case, viz., whether a pre-FSIA jurisdictional regime might be revived in order to gain jurisdiction over claims which the FSIA's jurisdictional provision does not permit a federal court to hear. And, in fact, the most telling thing about *Carl Marks* may be the fact that after concluding that the FSIA did not apply to the plaintiff's claims, the Second Circuit did not go on to analyze whether those claims might yet be heard under a pre 1952 jurisdictional regime. It did not have to do so because, as the district court in *Carl Marks* found, if the FSIA did not apply to the plaintiff's claims, there simply was no subject matter jurisdiction over those claims. *See Carl Marks & Co., Inc. v. Union of Soviet Socialist Republics*, 665 F.Supp. 323, 336 (S.D.N.Y.1987) ("The dispositive issue before this Court, therefore, is the same as that in *Slade* and *Jackson:* whether the FSIA applies retroactively so as to confer jurisdiction over a foreign sovereign for its commercial activities engaged in long before the effective date of the FSIA and before the 1952 Tate Letter. If so, this Court had jurisdiction to enter a default judgment, which should now be vacated granting leave to the Soviet Union to answer or move with respect to the Complaint. *If not, the Complaint must be dismissed for want of subject matter jurisdiction.*" (emphasis added)).

Finally, plaintiffs make the following assertion in their sur-reply: "Significantly, in its reply papers, SNCF fails to address the decision by Judge Sterling Johnson, Jr. holding, *inter alia*, that subject matter jurisdiction under 28 U.S.C. §§ 1331, 1350 and 1367 exists as to Holocaust-related claims. *See Bodner v. Banque Paribas*, 114 F.Supp.2d 117, 127–28 (E.D.N.Y. 2000)." Pls.' Sur Repl. at 5. Judge Johnson, however, did not evaluate and had no cause to evaluate a sovereign immunity defense. The defendants in Judge Johnson's case were private banking institutions operating in France during World War II and their predecessors or successors. *See id.* at 121; *see also id.* at 130–131 ("This is a lawsuit between private litigants for specific historical injury."). Consequently, he wrote, in addressing the applicability of the "Acts of State" doctrine: "In this case, it does not appear that this Court is being asked to pass judgment on the acts of a foreign state." *Id.* at 130. Thus, no sovereign immunity defense was possible. The banks simply did not fit into the FSIA's definition of a "foreign state," thereby rendering that statute wholly inapplicable. Accordingly, traditional jurisdictional principles of federal jurisdiction enunciated in §§ 1331, 1350 and 1367 applied to the case. They were not precluded by § 1330 and the FSIA. But this is not the case here. Plaintiffs have been unable to cite any authority where, after the enactment of the FSIA, a court invoked § 1331 or the Alien Tort Claims Act to establish subject matter jurisdiction over a foreign sovereign, as they seek to do here. The cases they cite do not support the proposition plaintiffs seek to establish, involving, as they do, either no foreign sovereign, *see Bodner supra; Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995) (finding subject matter jurisdiction over plaintiffs' claims of genocide and other acts in violation of international law against suspected Bosnian Serb war criminal Radovan Karadzic under the Alien Tort Claims Act) or conduct occurring before the enactment of the FSIA.

See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

Thus, whatever the weighty moral issues raised by plaintiffs' claims, this court simply has no jurisdiction over such claims by virtue of SNCF's uncontested and incontestable status as an agency or instrumentality of the nation of France here allegedly involved in actions to which no exception to the FSIA applies. There is, therefore, no need to address plaintiffs' claims that there would have been jurisdiction over SNCF prior to the passage of the FSIA. Implicitly, they are claiming, that the FSIA stripped that jurisdiction, despite Congress's intention to enact the restrictive theory of sovereign immunity and multiple judicial pronouncements confirming Congress's understanding. See, e.g., Schmidt v. Polish People's Republic, 742 F.2d 67, 71 (2d Cir.1984) ("the [FSIA] indisputably enhances a party's capacity to obtain personal jurisdiction over a foreign state").

Nevertheless, it is worth noting that plaintiffs' claims that pre–1952 sovereign immunity law would have worked to permit jurisdiction in this case appears unsupported. Every case cited by plaintiffs for the proposition that pre-FSIA law allowed suits for commercial acts involves a commercial act with some direct commercial connection to the United States, which is precisely the understanding that the commercial activities exception to the FSIA codifies. Plaintiffs have not adduced any case where an American court exercised jurisdiction over a foreign sovereign for commercial acts having no direct commercial effect on the United States, as is the case here. The cases they cite in their brief where jurisdiction was found to exist are all cases where a direct commercial effect on the United States existed. See (in reverse chronological order) Et Ve Ba-

lik Kurumu v. B.N.S. Internat'l Sales Corp., 25 Misc.2d 299, 204 N.Y.S.2d 971, 974 (Sup.Ct.N.Y.Co.1960) (contract with American businesses); In re Investigation of World Arrangements, 13 F.R.D. 280, 286 (D.D.C.1952) (purported violations of Sherman Act); The Uxmal, 40 F.Supp. 258, 259 (D.Mass.1941) ("This libel in rem is brought against the Mexican Steamship Uxmal. It is alleged that the libellant, a stevedore, was injured while discharging a cargo of logs at Baltimore."); Ulen & Co. v. Bank Gospodarstwa Krajowego (Nat'n Economic Bank), 261 A.D. 1, 24 N.Y.S.2d 201 (2d Dep't 1940) (suit on defendant's trust agreement with City of New York with the Chase National Bank as trustee); United States v. Deutsches Kalisyndikat Gesellschaft, 31 F.2d 199 (S.D.N.Y.1929) (suit brought by U.S. to enjoin alleged violations of antitrust laws by defendants); Coale v. Société Co-operative Suisse des Charbons, 21 F.2d 180 (S.D.N.Y.1921) (breach of contract with American company); Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 143, 3 L.Ed. 287 (1812) (merchant vessels entering U.S. territory for trade purposes). Deutsches Kalisyndikat Gesellschaft, upon which plaintiffs rely heavily, actually makes the requirement that there be a direct commercial effect on the United States quite explicit:

There has also been submitted a letter from the Secretary of State of the United States to the Attorney General, stating that it has long been the view of the Department of State that agencies of foreign governments engaged in ordinary commercial transactions in the United States enjoy no privileges or immunities not appertaining to other foreign corporations, agencies, or individuals doing business here, and that they should conform to the laws of this country governing such transactions.

*Id.* at 200.[8]

Plaintiffs also make mention of the "separate entity rule," which, they claim, prior to the enactment of the FSIA, permitted suits against corporate entities that had a distinct existence from the sovereign and were not the sovereign itself. In support of this claim, plaintiffs heavily rely on an article by William C. Hoffman in the Tulane Law Review, *see* William C. Hoffman *The Separate Entity Rule in International Perspective: Should State Ownership of Corporate Shares Confer Sovereign Status for Immunity Purposes?* 65 Tul. L.Rev. 535. According to Hoffman, § 1603(b) of the FSIA, which defined state-majority-owned corporations as "agenc[ies] or instrumentalit[ies]" of a foreign state entitled to sovereign immunity, did indeed broaden sovereign immunity from its pre–1952 coverage. *See id.* at 538–539. Hoffman writes:

> Most significantly, section 1603(b) does not require that an entity seeking the protections of the FSIA show that it is engaged in sovereign activity. Rather, section 1603(b)(2) creates a presumption that any foreign state-owned entity is engaged in sovereign activity. This presumption, which has virtually no support in international or pre-FSIA American law, actually enlarges the availability of the immunity defense. As presently written, section 1603(b) can confer sovereign status on any corporation owned in whole or in part by one or more foreign states, regardless of the nature of its activities.
>
> In the end, sovereign status can have the effect of immunizing entities that, but for state-ownership, are ordinary commercial corporations. . . .
>
> . . . .
>
> Section 1603(b) abolished its predecessor, the "separate entity rule." This rule, which today is the internationally recognized rule, provides that foreign state-owned entities with separate legal personalities generally are not entitled to assert sovereign immunity.

*Id.* at 539–40. "[C]ommentators criticized the separate entity rule, and Congress, in enacting the FSIA, adopted its opposite presumption in section 1603(b)," Hoffman continues. *Id.* at 540.

Certainly, it would seem that these excerpts from Hoffman's article lend some support to plaintiffs' claims that government entities, as opposed to governments, were entitled to sovereign immunity prior to 1976. However, Hoffman clarifies his broad statements about pre-FSIA international law and the application of the separate entity rule later in his article:

> By the 1920s, the separate entity rule was applied in the foreign sovereign immunity context in state and lower federal courts. Commercial corporations generally, whether wholly or partly owned

---

**8.** Plaintiffs adduced two cases in a post-oral argument submission to this court, these being *Wheeler v. Société Nationale Des Chemins De Fer Français*, 108 F.Supp. 652 (S.D.N.Y. 1952) and *Shulman v. Compagnie Generale Transatlantique*, 152 F.Supp. 833 (S.D.N.Y. 1957), both involving injuries occurring in Europe on SNCF trains. These cases were both premised on conduct that occurred during the era between 1946 and 1987 during which SNCF had a New York office where tickets for SNCF trains could be purchased. *See* Def.'s Letter of Sept. 13, 2001. But even more importantly, the decisions do not reject a sovereign immunity defense for SNCF. SNCF simply did not raise that defense in these cases. There are, of course, numerous reasons, legal, practical or strategic, why SNCF may have failed to assert a sovereign immunity defense. Without a court decision on the sovereign immunity issue, it cannot be concluded that plaintiffs' claim that they would have been able to sue SNCF on their current claims prior to the FSIA, which is otherwise belied by the caselaw and the history of the FSIA's enactment, is a valid one.

or controlled by a foreign state, were presumptively not immune. But "if a corporation functioned as a public agency or instrumentality or where evidence of corporate separateness from the government was not strong," the court could disregard the corporate form and grant immunity. Banking, shipping and railroad companies, as well as agricultural, mining, and other commercial corporations, were often granted or denied immunity solely on that basis.

*Id.* at 545–548. Specifically with respect to railroad corporations, Hoffman added the following footnote:

Railway corporations were almost uniformly held immune, although for various reasons. *Compare Oliver Am. Trading Co. v. Mexico,* 5 F.2d 659, 661, 665 (2d Cir.1924) (Mexican National Railroad possessed, controlled and operated by state for "national purposes") with *Bradford v. Director Gen. of R.R. of Mex.,* 278 S.W. 251, 252 (Tex.Civ.App. 1925) (Mexican National Railroad held an "agent" of the state) and *Mason v. Intercolonial Ry. of Canada,* 197 Mass. 349, 83 N.E. 876 (1908) (Canadian railway not a corporation and operated by sovereign in a governmental function). *But see Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter,* 300 F. 891, 892 (Swedish railway corporation held [by Judge Learned Hand to be] entity separate from state).

*Id.* at 546, n. 62.

Plaintiffs attempt to cast doubt upon the applicability of this portion of Hoffman's article:

[T]he single sentence SNCF relies on from the Hoffman article is merely a footnote in a paragraph on the separate

entity rule, which generally held that a separate corporation, whether wholly owned by a sovereign or not, was presumptively not immune. That footnote cites several inapposite cases relied upon by SNCF. In each of these cases, however, the railroad was found by the court either not to be a separate corporation, or was not operated as a separate entity.

Pl.'s Repl. at 7. However, plaintiffs' argument fails for several reasons. The paragraph from the Hoffman article to which plaintiffs point, in addition to saying that corporations, whether wholly owned by the government or not, were generally not immune, also specifically said, as quoted above, that " 'if a corporation functioned as a public agency or instrumentality or where evidence of corporate separateness from the government was not strong,' the court could disregard the corporate form and grant immunity."

SNCF, it must be remembered, is no regular corporation. It is, in fact, not a corporation at all, but, as noted in the "Background" section above, an "établissement public industriel et commercial," an instrumentality of the state charged with performing a public service, namely, operating a monopoly railroad in France. Haimo Decl. ¶¶ 2–3. It has no shares or shareholders. *See id.* ¶ 3. Its President and governing board are appointed by the French government. *See id.* SNCF's employees are, in large majority, governed by a special statute which grants them rights reserved generally to public servants under French Law. *See id.* It can exercise police powers and powers of eminent domain normally reserved to the state.[9] *See id.*

---

9. It is true that this description reflects SNCF as it is currently organized, and its organization may have been slightly different during the era at issue in this case. However, it was fundamentally the same entity serving the same function and wholly owned by the government of France. Plaintiffs have conceded as much.

The cases cited in the Hoffman article may involve fact patterns where an even higher degree of government control was present, yet the holdings of these cases did not seem to turn on this fact. In *Oliver*, for example, the Second Circuit, in holding that the National Railways of Mexico were entitled to sovereign immunity in the United States, noted:

> It is said that the Mexican government, in operating the National Railways of Mexico, is engaged in trade and in a nongovernmental enterprise. This view of the matter we do not accept. It is a fact, of which we take judicial notice, that in the leading countries of Europe, as well as in Canada, it is the practice of governments to own and operate the railways. This is not regarded by them as engaging in trade, but as the performance of a fundamental governmental function. It evidently is so regarded in Mexico, and while in the United States the railways are not owned and operated by either the state or federal governments, we are not justified, on that account, in holding that the Mexican government is engaged in trade, and not performing a governmental function, in operating the National Railways of Mexico.

*Oliver*, 5 F.2d at 665. This understanding was echoed six years later by the Second Circuit in *Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen, Inc.*, 43 F.2d 705 (2d Cir.1930), where the court, in holding that sovereign immunity extends to the rail system of Sweden, noted that "[t]he railroads are a part of the public property, and their operation is a governmental enterprise." *Id.* at 510. These are Second Circuit cases from the relevant period with language that seems to be directly on point. The factual distinction that plaintiffs seek to make between the railroads in those cases and the present one does not appear to be a meaningful one, given both this language and SNCF's indisputable status as a public entity with a form and function very different from a regular corporation engaged in for-profit business dealings.

At most, even if it is said, against the weight of the law cited above, that plaintiffs have succeeded in creating an ambiguity about pre-FSIA law (but then, the FSIA was enacted, in part, specifically because pre-FSIA law was unpredictable), an ambiguity does not give rise to solid expectations of legal consequences that could be unfairly and retroactively undermined by a subsequent clarification in the law.[10] In any case, even if any such ambiguity existed in pre-FSIA law, this court would have no subject matter jurisdiction over plaintiffs' claims.

---

10. Moreover, if plaintiffs' argument is, following Hoffman, that the FSIA, in enacting § 1603(b)(2) in 1976, overturned the "separate entity rule" in existence until then, their attempt to use the Second Circuit's decision in *Carl Marks* to argue that the FSIA has been held not retroactive prior to 1952 is significantly weakened. This is because while the FSIA may have codified the restrictive theory of sovereign immunity in existence since at least 1952, thereby making it fair to hold the statute retroactive to that year, the FSIA, adopting plaintiffs' position, abolished the separate entity rule in existence up until *1976*. Thus, it would not have been fair to litigants to hold the statute retroactive even to 1952 for these purposes. The entire rationale behind the 1952 date established by *Carl Marks* would fall apart, at least for the purposes of the case at bar. Plaintiffs, instead of relying on *Carl Marks* would have to try, then, to distinguish *Carl Marks* and argue, without any caselaw to help them, that while most of the FSIA has been held retroactive to 1952, § 1603(b), insofar as it conflicts with the separate entity rule, should not be applied retroactively *at all*. While that position may have some appeal, unfortunately for plaintiffs, there is no authority for the proposition.

## Conclusion

Because plaintiffs have failed to show a basis for subject matter jurisdiction under the FSIA over their claims against SNCF, and no other basis for subject matter jurisdiction over these claims exists, SNCF's motion to dismiss is granted.[11]

SO ORDERED.

---

11. Plaintiffs' cross-motion for further discovery relevant to the sovereign immunity issues is denied, since plaintiffs have not adduced any factual issues the resolution of which could possibly change the outcome of the sovereign immunity inquiry. Plaintiffs' motion for discovery specifies two possible factual areas worthy of exploration:

First, Plaintiffs are entitled to discover relevant information concerning the structure, operations, finances, property, assets, investments, and management of SNCF (and related entities) during the relevant time period, among other potential areas of inquiry. The Terrier declaration submitted by SNCF does not address these questions in any genuinely useful form. Secondly, there may be more lawsuits, of which Plaintiffs are currently unaware, in which SNCF did not raise sovereign immunity as a defense, or took other actions which should be construed as an estoppel or waiver.

Pls.' Mem. at 32. However, plaintiffs have conceded that the SNCF is an entity wholly owned by the French government, *see* Pls.' Compl. ¶ 17. There is, therefore, no genuine dispute about whether or not SNCF falls into the definition of a "foreign state" for the purposes of the FSIA. As far as other lawsuits in which SNCF may have failed to raise a sovereign immunity defense, failing to raise a sovereign immunity defense in another case does not constitute a waiver of sovereign immunity in this case. *See* discussion of three possible bases for finding a waiver of the sovereign immunity defense *supra*. Plaintiffs have, consequently, not alleged any facts that, if true, would change the outcome of the subject matter jurisdiction determination.